Brent E. CLARY, Roger W. Bennett, and Bennett, Boehning & Clary, Appellants–Defendants/Cross–Appellees,

v.

LITE MACHINES CORPORATION, Appellee–Plaintiff/Cross–Appellant.

No. 79A05–0411–CV–610.

Court of Appeals of Indiana.

July 11, 2006.

Richard R. Skiles, Skiles DeTrude, Indianapolis, IN, Attorney for Appellants.

Ronald J. Waicukauski, Carol A. Nemeth, Price Waicukauski Riley & DeBrota, LLC, Indianapolis, IN, Attorneys for Appellees.

## OPINION

CRONE, Judge.

### Case Summary

Brent E. Clary, Roger W. Bennett, and Bennett, Boehning & Clary (collectively, "BB & C") appeal the trial court's entry of summary judgment in favor of Lite Machines Corporation ("Lite") and the jury's subsequent award to Lite of $3,612,574.00. On cross-appeal, Lite challenges the trial court's denial of its motion for prejudgment interest. We affirm.

### Issues

BB & C presents seven issues, which we consolidate and restate as the following six:

I. Whether the trial court erred by denying its motion for summary judgment;

II. Whether the trial court abused its discretion by admitting three documents from the underlying case—specifically, Judge Donald C. Johnson's findings of fact, conclusions of law, and judgment; his subsequent order; and the memorandum decision of this Court;

III. Whether the trial court abused its discretion by denying BB & C the opportunity to examine Judge Johnson, who presided over the underlying case;

IV. Whether the trial court abused its discretion by admitting evidence of Lite's alleged lost profits from 1998 through 2004;

V. Whether there was sufficient evidence to sustain the jury's award; and

VI. Whether Lite was required to prove that a greater damages award would have been collectible.

On cross-appeal, Lite presents one issue, which we restate as whether the trial court erred by denying Lite's motion for prejudgment interest.[1]

### Facts and Procedural History

In January 1991, brothers Paul Arlton and Dave Arlton formed Lite for the purpose of manufacturing radio-controlled model helicopters. In June 1991, Lite purchased a milling and routing machine (the "Mill") manufactured by Techno, Inc., a division of Designatronics, Inc. Lite planned to use the Mill, which cost approximately $12,000, to produce aluminum molds, cut plywood parts, and trim molded plastic parts. In January 1992, Lite began to notice problems with the Mill's performance. Because the Mill was unique at that time, Lite would have had to purchase three different machines at a cost of approximately $200,000 in order to replace it. For over a year, Techno attempted to fix the Mill several times and promised Lite that it would resolve the problems. Be-

---

1. Oral argument was held in Indianapolis on May 17, 2006. We commend counsel for their excellent presentations, which assisted us greatly in our deliberations.

cause of the Mill's failure to perform, Lite was unable to produce its model helicopters on schedule.

In December 1993, Lite filed a complaint against Techno and Designatronics, alleging negligence and breach of warranty. Lite was represented by BB & C. At trial in October 1997, Lite sought damages in the amount of approximately four million dollars for its alleged lost profits between 1992 and 1996. At least one year before trial, Techno informed BB & C that it planned to raise Lite's failure to mitigate damages as an affirmative defense. In a memorandum dated October 17, 1996, which BB & C later admitted receiving the next day, counsel for Techno explained the mitigation defense and cited several cases on the issue. Approximately one month prior to trial, Techno identified Robert McDonald as an expert witness who would testify on several issues, including Lite's failure to mitigate. Techno offered to make McDonald available for deposition at its own expense, but BB & C declined the offer. At the bench trial, McDonald testified that in early 1992, Lite could have purchased a "knee mill" for between $17,000 and $28,000 to replace the defective Mill and mitigate its damages. BB & C presented no rebuttal evidence to McDonald's testimony and declined the opportunity to cross-examine McDonald.[2] In pre- and post-trial briefs, Techno argued a mitigation defense. BB & C failed to address this issue in its pre-trial brief and did not file a post-trial brief.[3]

On January 29, 1998, Judge Johnson entered the trial court's findings of fact, conclusions thereon, and judgment. The court found, among other things, that Lite had sustained $2,609,608 in net lost profits due to the malfunctioning of the Mill. Appellants' App. at 2156 (Finding 280). The judgment reads in pertinent part: "The Court now enters judgment against [Techno and Designatronics] in favor of [Lite] in the amount of Two Hundred and Sixty Thousand Dollars ($260,000.00) which compensates [Lite] for the damages caused by [Techno and Designatronics] and after finding [Lite] failed to mitigate its damages by replacing the defective machine in a more timely manner." Appellants' App. at 2173.

In March 1998,[4] Lite filed a motion to correct error that stated, "Because [Techno] bore the burden of proof on failure to mitigate damages, and because there was no evidence that Lite did fail to mitigate, Lite may have neglected this topic in its trial brief and post-trial submissions." Plaintiff's Exh. 54 at 7. On June 1, 1998, the trial court entered an order modifying some findings and conclusions without altering the judgment against Techno and Designatronics. Appellants' App. at 2175–78. The trial court made additional findings and conclusions, including the following: "A suitable replacement for the Techno machine could have been purchased by Lite for $17,000 to $28,000 on or about May 11, 1992[,]" and "[a] substantial part of the consequential damages of Lite reasonably could have been avoided by cover—buying a replacement machine—on or about May 11, 1992." *Id.* at 2176, 2177 (Finding 294, Conclusion 39).

In June 1998, BB & C attorney Bennett began to prepare for an appeal to this

---

2. In fact, the panel of this Court that heard Lite's appeal characterized McDonald's testimony as "unchallenged." *Lite Mach. Corp. v. Techno, Inc.*, No. 79A02–9807–CV–568, 720 N.E.2d 776, slip op. at 10 (Ind.Ct.App. Nov.29, 1999), *trans. denied* (2000).

3. In its proposed findings of fact, Lite included several findings suggesting that Lite attempted to mitigate its damages. There was no caselaw cited, nor any legal argument made, however.

4. The record does not reveal the exact filing date of Lite's motion to correct error.

Court of the *Techno* court's judgment. At that time, he researched—for the first time—the issue of mitigation of damages under Indiana law and discovered two reported Indiana cases and one reported Seventh Circuit case which suggested that Lite would have had no legal duty to mitigate its damages if it could show that Techno had continued to promise an imminent solution to the problems with the Mill. In a memo to Dave Arlton dated June 12, 1998, Bennett attached his research file on the subject, briefly explained its significance, and stated, "It would be legitimate to ask why I didn't find these cases before. On the mitigation cases, the short answer is that we didn't think failure to mitigate would be an issue when the evidence was heard." Plaintiff's Exh. 43.

On appeal to another panel of this Court, Lite cited cases discovered in Bennett's post-trial research and argued that it was not required to mitigate its damages because Techno had " 'continually' provided assurances to Lite that the problems would be remedied and that it would place the machine in a working capacity." *Lite Mach. Corp. v. Techno, Inc.*, No. 79A02–9807–CV–568, 720 N.E.2d 776, slip op. at 7–8 (Ind.Ct.App. Nov. 29, 1999), *trans. denied* (2000). In that review, however, this Court was limited to the evidence within the record. At the *Techno* trial, Lite presented no evidence of vendor assurance. BB & C's failure to timely identify the legal doctrine that could have countered Techno's claim regarding Lite's duty to mitigate damages may have precluded the presentation of any such evidence that would have been necessary to prevent the trial court's reduction in damages for

Lite's failure to mitigate. Based upon Techno's evidence, including McDonald's unchallenged testimony, this Court affirmed the trial court's judgment that Lite had a duty to mitigate and failed to do so.[5] *Id.* at 10.

Lite filed suit against BB & C in December 2000. Lite filed a first amended complaint on August 12, 2003. The complaint alleged, among other things, that BB & C provided negligent representation to Lite in its case against Techno and Designatronics and that BB & C committed criminal conversion and breach of fiduciary duty by failing to deliver to Lite—for more than one year—the *Techno* judgment proceeds to which Lite was entitled. On February 20, 2004, BB & C moved for summary judgment. After a hearing on April 26, 2004, the trial court denied BB & C's motion.

A jury trial began on June 1, 2004. On June 10, 2004, the jury returned a verdict in favor of Lite in the amount of $3,612,574.00. On July 12, 2004, BB & C filed a motion to correct error. On July 13, 2004, the trial court issued its final order and judgment, awarding the total amount of the jury's verdict. On August 9, 2004, BB & C filed a renewed motion to correct error. On October 17, 2004, the trial court issued an order denying BB & C's motion to correct error and renewed motion to correct error. This appeal and cross-appeal ensued.

### Discussion and Decision

### I. Denial of Summary Judgment

#### A. Standard of Review

BB & C claims that the trial court erred by denying its motion for summary judg-

---

5. We upheld the trial court's findings on several other issues as well. We concluded that the trial court properly determined that Lite had the means to replace the defective Mill in May, 1992; that the trial court properly excluded Lite's anticipated royalties and salaries from its damages calculation; that the trial court properly calculated Lite's total damages of $2,609,608; and that the amount actually awarded—$260,000—was within the scope of the evidence. *Lite v. Techno,* slip op. at 16.

ment. Our standard of review is well settled.

On appeal from the denial of a motion for summary judgment, we apply the same standard applicable in the trial court. Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). We therefore must determine whether the record reveals a genuine issue of material fact and whether the trial court correctly applied the law. A genuine issue of material fact exists where facts concerning an issue, which would dispose of the litigation are in dispute, or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. If the material facts are not in dispute, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts. When there are no disputed facts with regard to a motion for summary judgment and the question presented is a pure question of law, we review the matter de novo.

*Bd. of Tr. of Ball State Univ. v. Strain,* 771 N.E.2d 78, 81–82 (Ind.Ct.App.2002) (quotation marks and some citations omitted).

Lite questions whether BB & C may appeal the trial court's denial of summary judgment following a trial on the merits. We have addressed this procedural issue before.

Generally, an order denying summary judgment is not a final appealable judgment because it does not irretrievably dispose of one or more issues between the parties; neither does it determine nor foreclose the rights of the parties. Rather, the denial of a motion for summary judgment merely places the parties' rights in abeyance pending ultimate determination by the trier of fact. Therefore, a party seeking review of denial of a summary judgment motion must ordinarily do so by way of interlocutory appeal. Yet, once final judgment is entered following trial, the ultimate determination of the trier of fact upon the merits of the claim has occurred, and the interlocutory nature of the denial of summary judgment terminates. Accordingly, a party who fails to bring an interlocutory appeal from the denial of a motion for summary judgment may nevertheless pursue appellate review after the entry of final judgment.

*Id.* at 81 (citations and quotation marks omitted).

### B. Proximate Cause

■ A defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim. *Colen v. Pride Vending Serv.,* 654 N.E.2d 1159, 1162 (Ind.Ct.App.1995), *trans. denied* (1996). Under Indiana law, the elements of legal malpractice are: (1) employment of an attorney, which creates a duty to the client; (2) failure of the attorney to exercise ordinary skill and knowledge (breach of the duty); and (3) that such negligence was the proximate cause of (4) damage to the plaintiff. *Rice v. Strunk,* 670 N.E.2d 1280, 1283–84 (Ind.1996). "Proximate cause requires that there be a reasonable connection between the defendant's allegedly negligent conduct and the plaintiff's damages. Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct." *Gates v. Riley ex rel. Riley,* 723 N.E.2d 946, 950 (Ind.Ct.App.2000) (citations omitted), *trans. denied.* In the malpractice action, then, it was Lite's burden to prove, among other things, that but for BB & C's failure to research and argue the issue of mitigation of damages before and/or dur-

ing the *Techno* trial, Lite would have received a greater damages award.

■ BB & C argues that the trial court should have granted summary judgment in its favor because there was no genuine issue of material fact regarding the element of proximate cause. BB & C claims that "[e]ach of Lite's alleged bases of malpractice rested on nothing but speculation that a reasonable factfinder would have awarded a higher verdict had [BB & C] acted differently." Appellant's Br. at 11. However, the trial court's findings of fact, conclusions thereon, and judgment following the *Techno* trial show that Lite's failure to respond to Techno's mitigation of damages argument resulted in a lesser damage award. The trial court's findings of fact include the following: "Lite's continuing cash flow problems and current situation are [causally] rooted in the failure of the Techno Systems and in Techno's persistent promise of timely correction." Appellants' App. at 2154 (Finding 261). Its conclusions include the following: "The failure of Lite's Techno System postponed the introduction of Lite's helicopter to the market from about June of 1992 to October of 1994." *Id.* at 2161 (Finding 29). Finally, the judgment states,

The Court now enters Judgment against Defendants in favor of the plaintiff in the amount of Two Hundred and Sixty Thousand Dollars ($260,000.00) which compensates the Plaintiff for damages caused by the Defendant and after finding the Plaintiff failed to fully mitigate its damages by replacing the defective machine in a more timely manner.

*Id.* at 2173. Also, as set out in the facts above, the trial court issued a second order in June 1998, in which it made additional findings indicating that Lite's failure to mitigate reduced the amount of its damages award.

Clearly, the *Techno* court's own words suggest that BB & C's failure to research and argue the mitigation issue contributed to the reduced damages award in that case. Thus, the trial court properly denied BB & C's motion for summary judgment.[6]

### C. Attorney Judgment Rule

BB & C also argues that the trial court erred by failing to apply the "attorney judgment rule" (also referred to as "judgmental immunity") when it considered BB & C's motion for summary judgment. Many states—Indiana is not one of them—have adopted this rule, under which an attorney's "mere errors in judgment" cannot support a legal malpractice claim. *See Simko v. Blake*, 448 Mich. 648, 532 N.W.2d 842, 847 (1995). The Sixth Circuit explained the rationale behind the rule as follows:

[T]here can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment. This is a sound rule. Otherwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight. . . . To hold that an attorney may not be held liable for the choice of trial tactics and the conduct of a case based on professional judgment is not to say, however, that an attorney may not be held liable for any of his actions in relation to a trial. He is still bound to exercise a reasonable de-

---

6. As mentioned above, BB & C challenges the trial court's admission of the *Techno* court's findings of fact, conclusions thereon, and judgment, as well as its subsequent order, which included additional findings and conclusions. Because we conclude below that these documents were properly admitted, we find them persuasive in our proximate cause analysis.

gree of skill and care in all his professional undertakings.

*Woodruff v. Tomlin,* 616 F.2d 924, 930 (6th Cir.1980) (citations omitted), *cert. denied.* BB & C contends that we should apply the attorney judgment rule in this case.

■ In Indiana, an attorney is generally required "to exercise ordinary skill and knowledge." [7] *Rice,* 670 N.E.2d at 1283–84. In order to succeed in a legal malpractice claim, the plaintiff must prove, among other things, that the attorney breached that duty.[8] *Id.* As for judgmental immunity, our research revealed only one Indiana case addressing the issue. In *Oxley v. Lenn,* 819 N.E.2d 851 (Ind.Ct. App.2004), this Court discussed the concept of exempting an attorney's judgment error from malpractice and applied the reasoning of the Kansas Supreme Court:

> "While the exception for an error in judgment in legal malpractice actions is a narrow one and should not be employed where the issue is settled and can be identified through ordinary research and investigative techniques, the exception applies in a case such as this, where the law is unclear, unsettled by case law, and is an issue upon which reasonable doubt may well be entertained by informed counsel."

*Id.* at 853 (quoting *Bergstrom v. Noah,* 266 Kan. 847, 974 P.2d 531, 557 (1999)).

■ In fact, our research indicates that all of the states—whether they have adopted the attorney judgment rule or not—that have addressed the issue of legal research (or lack thereof) as malpractice have found that an attorney's duty to his client encompasses knowledge of the law and an obligation to perform diligent research and provide informed judgments. *See Wright v. Williams,* 47 Cal.App.3d 802, 121 Cal.Rptr. 194, 199 (1975); *see also Janik v. Rudy, Exelrod & Zieff,* 119 Cal. App.4th 930, 14 Cal.Rptr.3d 751, 755 (2004), *rev. denied* (when rendering advice to a client, an attorney assumes an obligation to undertake reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based on an intelligent assessment of the problem); *Rock v. ATPIC Trucking Co.,* 739 So.2d 874, 879 (La.Ct.App.1999) (attorney owes his clients the duty of diligent investigation and research upon being hired for representation, especially in ongoing litigation); *Fiorentino v. Rapoport,* 693 A.2d 208, 213 (Pa.Super.1997) (attorney is not required to be infallible but is expected to conduct that measure of research sufficient to allow client to make informed decision), *trans. denied.* BB & C argues that its decisions regarding the mitigation of damages issue—choosing not to depose Techno's expert on the issue, choosing not to address the issue before or during trial—were mere errors in judgment for which they are immune. We disagree. Because BB & C failed to research the mitigation issue until *after* the trial in the *Techno* case, despite being put on notice that

---

**7.** As stated above, an attorney practicing in a jurisdiction that has adopted the attorney judgment rule is required to exercise "a reasonable degree of skill and care," while an attorney practicing in Indiana is required to comply with a very similar standard—to exercise "ordinary skill and knowledge." *Woodruff,* 616 F.2d at 930; *Rice,* 670 N.E.2d at 1283–84. BB & C suggests that the attorney judgment rule provides much broader immunity with regard to attorneys' judgments than the Indiana standard of care. However, in our view, to the extent that there is a difference between the two standards, it is not a significant one.

**8.** BB & C apparently concedes that it breached the duty to exercise ordinary skill and knowledge, as the only element it challenges under the Indiana malpractice standard is proximate cause.

Techno would raise it as an affirmative defense, any judgments it made with regard to this issue prior to and during trial were certainly not informed ones. Thus, BB & C would not be entitled to immunity under the attorney judgment rule.

We also note that judgmental immunity jurisdictions do grant lawyers immunity from legal malpractice claims where the lawyers' judgment involved a "clouded state of the law," i.e., a point of law that is unsettled. *See Robinson v. Southerland,* 123 P.3d 35, 43 (Okla.Civ.App.2005), *cert. denied; see also Meir v. Kirk, Pinkerton, McClelland, Savary & Carr, P.A.,* 561 So.2d 399, 402 (Fla.Dist.Ct.App.1990) (because timing of statute of limitations period was debatable point of law, attorney's good faith exercise of professional judgment was immune from malpractice claim), *rev. denied; Jerry's Enter., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.,* 711 N.W.2d 811, 818 (Minn.2006) (an attorney is not liable for an error of judgment or mistake in a point of unsettled law); *Baker v. Fabian, Thielen & Thielen,* 254 Neb. 697, 578 N.W.2d 446, 451–52 (1998) (attorney's judgment or recommendation on unsettled point of law is immune from liability); *Roberts v. Chimileski,* 175 Vt. 480, 820 A.2d 995, 998 (2003) (judgmental immunity doctrine protects attorneys from liability where they advised client about development scheme, the legality of which was unsettled at the time advice was given).

At the time of the *Techno* trial, Indiana law regarding an injured party's duty to mitigate damages was not unsettled. As Bennett stated in his memo to Dave Arlton on June 12, 1998, there were at least two Indiana cases and one federal case that "strongly support[ed][the] conclusion" that "[Lite] had no duty to mitigate because Techno was continually promising an imminent solution." Exh. 43. Further, there were no Indiana cases contradicting that conclusion. The favorable Indiana cases that Bennett noted in his June 1998 research file were *Aamco Transmission v. Air Systems, Inc.,* 459 N.E.2d 1215 (Ind. Ct.App.1984) (because transmission repair business made repeated assurances to van owner that repairs would be completed shortly, owner did not have duty to mitigate damages by retrieving van and conducting business while awaiting repair part that was delayed) and *T & W Building Co. v. Merrillville Sport & Fitness, Inc.,* 529 N.E.2d 865 (Ind.Ct.App.1988), *trans. denied* (1989) (tenant was not obligated to mitigate damages caused by landlord's failure to repair electrical, heating, and plumbing systems by making its own repairs where landlord gave assurances that it would cure the problems). Both of these cases cite *Shearson Hayden Stone, Inc. v. Leach,* 583 F.2d 367 (7th Cir.1978), the favorable federal case that BB & C later cited in Lite's appeal to this Court of the *Techno* judgment. In *Shearson,* the Seventh Circuit held that "if assurances are made that performance will be forthcoming, or, if other circumstances indicate that the breaching party intends to perform, then, even thought the contract has been breached, no duty to mitigate arises." 583 F.2d at 371. All of these cases were decided long before Lite filed suit against Techno and Designatronics.

In sum, because the attorney judgment rule would not relieve BB & C from its liability in this particular case, we need not consider actually adopting the rule. As discussed above, the applicable law was settled, the BB & C attorneys failed to research the issue of Lite's duty to mitigate its damages even after it was raised by opposing counsel prior to and during trial, and any of BB & C's professional judgments on the issue were therefore uninformed and would not be entitled to immunity.

## II. Admission of Evidence

■ BB & C contends that the trial court erred in admitting documents from the *Techno* trial, including the trial court's findings of fact, conclusions thereon, and judgment; its order disposing of Lite's motion to modify findings and correct error; and this Court's memorandum decision affirming the trial court's judgment.

We review rulings on the admissibility of evidence for an abuse of discretion. An abuse of discretion occurs only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. Even if a trial court errs in a ruling on the admissibility of evidence, this court will only reverse if the error is inconsistent with substantial justice.

*Gregory & Appel Ins. Agency v. Philadelphia Indem. Ins. Co.*, 835 N.E.2d 1053, 1056 (Ind.Ct.App.2005) (citations omitted), *trans. denied* (2006).

■ At trial, BB & C objected to the admission of the judgment and subsequent order on the basis of relevancy. In its appellant's brief, BB & C argues that the admission of these documents violated its right to a jury trial under Article One, Section Twenty of the Indiana Constitution by "invad[ing] the province of the [malpractice] case, prejudicing [BB & C's] right to trial of the particular claims against the Firm (as opposed to those against Techno) by jury determination." Appellant's Br. at 19. We agree with Lite's contention that BB & C waived this constitutional argument because it was not asserted at trial. *See Sandifur v. State*, 815 N.E.2d 1042, 1045 (Ind.Ct.App.2004) (party may not present one ground for an

objection at trial and raise new ground on appeal), *trans. denied*. In its brief, BB & C also mentions its objection at trial—under Indiana Appellate Rule 65(D) [9]—to the admission of this Court's memorandum decision. Because BB & C fails to make any appellate argument regarding this issue, however, it is waived. *See* Ind. Appellate Rule 46(A)(8)(a) (appellant's contentions must be supported by cogent reasoning and citation to authority).

■ As for the issue of relevancy, the documents at issue were relevant to the trial in this case. Our supreme court has held that "[w]here the attorney's alleged act of malpractice occurred at trial, . . . the entire course of events at the first trial becomes relevant to the malpractice claim." *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 344 (Ind.1991). In its findings of fact, conclusions thereon, and judgment, and in its subsequent order, the *Techno* court stated the factual and legal basis for its decision, including its finding regarding the amount of damages Lite sustained and its determination that Lite failed to mitigate its damages. The judgment—approximately ten percent of Lite's net lost profits—indicates that Lite's failure to mitigate was a significant factor in the *Techno* court's calculation of damages. This Court's memorandum opinion affirmed the trial court's judgment and specifically noted that the expert testimony regarding Lite's ability to mitigate by using a knee mill machine went unchallenged by BB & C. *Lite*, slip op. at 10.

Contrary to Lite's assertion, we note that Robert McDonald, an expert in making molds and machine purchases, testified that a "knee mill" would have

---

**9.** Indiana Appellate Rule 65(D) prohibits the use of not-for-publication memorandum decisions as precedent and permits the citation of such decisions only by the parties to the case and only to establish res judicata, collateral estoppel, or law of the case. In its brief and at the malpractice trial, BB & C mistakenly cited Indiana Appellate Rule 15, which was the previous source of this rule.

been a suitable replacement for Lite and could have been purchased for [$17,000 to $28,000]. McDonald owned a shop in Indianapolis and designed injection molds for the automotive, electronics, aerospace and medical industries. McDonald further testified that his company used knee mills to make all of its molds, and confirmed that knee mills were "suitable to make a number of small injection molds out of aluminum." Additionally, McDonald noted that the knee mill would have been suitable to rout parts of plywood and added that he had used one to "cut a lot of wood." *In light of this unchallenged testimony, the trial court could reasonably infer that the knee mill would have been a suitable replacement for the Techno machine.*

*Id.* at 9–10 (citations to record omitted) (emphasis added). In sum, we conclude that all of these documents are relevant to the issue of whether BB & C's actions and/or omissions at trial proximately caused damage to Lite in the form of a reduced judgment.

### III. Examination of Judge Johnson

■ BB & C argues that the trial court abused its discretion in denying BB & C the opportunity to examine Judge Donald C. Johnson, the *Techno* trial judge, at the malpractice trial. During BB & C's offer to prove, Judge Johnson testified that in his opinion, $260,000.00 was an appropriate damages award "[w]hether or not mitigation was an issue in the case." Appellants' App. at 2112–13. BB & C contends that Judge Johnson's testimony would have convinced the jury that BB & C's actions and/or omissions did not proximately cause Lite's lesser damages award.

This Court has held that the presiding judge in an underlying case should not testify in a subsequent legal malpractice action. *Cornett v. Johnson,* 571 N.E.2d

572, 575 (Ind.Ct.App.1991). In *Cornett,* we referenced a California court's rationale on this issue:

"We think it prejudicial to one party for a judge to testify as an expert witness on behalf of the other party with respect to matters that took place before him in his judicial capacity. In such instance the judge appears to be throwing the weight of his position and authority behind one of two opposing litigants."

*Id.* (quoting *Merritt v. Reserve Ins. Co.,* 34 Cal.App.3d 858, 110 Cal.Rptr. 511 (1973)). Also, we noted that permitting evidence of what the trial judge would have awarded if the evidence had been different would open the door to permitting the jury to testify in a subsequent malpractice action as to how it would have decided the original action if the case had been properly presented. "Obviously, this is impractical, inefficient, and '[t]he specter of such a scene throws a chill down our judicial spine.'" *Id.* (quoting *Phillips v. Clancy,* 152 Ariz. 415, 733 P.2d 300, 306 (1986)).

These concerns remain with us as we consider the admissibility of Judge Johnson's testimony. His authority as a judge, and more specifically, as the trial judge who made the findings and judgment at issue in the malpractice case, would likely carry tremendous weight with the jury, risking unfair prejudice to Lite. BB & C argues that Judge Johnson's written findings and judgment are likewise overly influential, and that if his testimony was properly excluded, then those documents should have been as well. We disagree. Written judicial findings and judgments are part of a court's record, obviously prepared by a judge for public scrutiny. We find such documents clearly distinguishable from a judge's testimony about the personal impressions, thoughts, and reasoning that led him to rule a certain way and his speculation about how he might

have ruled if the evidence had been different. We must protect the integrity of the judicial deliberative process, as the risks of subjecting it to review far outweigh any possible benefits therefrom. A court's written record, however, generally does not warrant such protection.

Clearly, the excluded testimony of Judge Johnson indicates that, in his opinion (contrary to his written findings, conclusions, and judgment and subsequent order), the $260,000.00 award was appropriate regardless of mitigation considerations. This is exactly the kind of testimony that *Cornett* prohibits due to the great risk of unfair prejudice to Lite if it were to be admitted. In our view, it is not any more appropriate for a trial judge to impeach his verdict than it is for a jury to impeach theirs. Thus, we conclude that the trial court properly denied BB & C's request to allow Judge Johnson to testify at trial.

### IV. Admission of Evidence of 1998–2004 Lost Profits

■ BB & C also argues that the trial court abused its discretion by admitting evidence of Lite's net lost profits for the years 1998 through 2004. As he did at the *Techno* trial, CPA Michael Strauch testified in the instant case that Lite sustained net lost profits of $2,609,608 during the years 1992 through 1996 because of Tech-

no's defective Mill. The *Techno* court found that Lite had sustained net lost profits of $2.6 million through December 1996.[10] Strauch testified in Lite's case against BB & C that the *Techno* court should have awarded Lite $4,200,000—$2,609,608 for net lost profits from 1992 to 1996, $902,997 for net lost profits in 1997, and $698,449 for unpaid royalties—if BB & C had not breached its duty to Lite. Strauch also stated that Lite sustained net lost profits in the amount of $5,750,070 during the years 1998 through 2004 because of BB & C's negligence.[11]

BB & C argues that if Lite were permitted to recover lost profits for the years 1998 through 2004, then it would receive a windfall because evidence of these losses was not presented at the *Techno* trial, and thus Lite could not have recovered them then.[12] These damages, however, are not simply further damages caused by the faulty Mill and thus attributable to Techno; rather, Strauch identified them as damages directly resulting from BB & C's negligent representation, which resulted in the *Techno* court's decision to award only a portion of Lite's claim. In other words, Strauch testified that if Lite had been awarded the total damages it had sustained at the time of the *Techno* trial—

**10.** Damages sustained in 1997 were not considered in the *Techno* trial, even though it did not begin until October of that year, because BB & C failed to request that Strauch update his damages calculations that he had originally prepared for a 1996 trial date.

**11.** Purdue University Professor David Denis, an expert in corporate finance, also testified as to Lite's lost profits. He stated that Lite's inability to produce its product in June 1992 restricted its production ability thereafter. He also explained how the depletion of Lite's start-up capital had a long-term negative effect on Lite's profitability. BB & C does not challenge the admission of Denis's testimony, however.

**12.** BB & C cites *Schultheis v. Franke*, 658 N.E.2d 932 (Ind.Ct.App.1995), *trans. denied* (1996), in support of its contention that Lite's recovery of damages not accrued at the time of the *Techno* trial would be a "windfall" and thus not viewed favorably under the law. We note, however, that *Schultheis* addressed a very different issue, finding that an attorney who renders services for a client and is later sued by that client for malpractice is entitled to a deduction in any malpractice award equal to the reasonable value of his services. *Id.* at 941.

approximately $4.2 million—then that amount (less attorney fees, compensation, and debt) would have been reinvested in the company, which would have led to greater production and greater profits during the next several years. In our view, Strauch's testimony in the malpractice case regarding lost profits for the years 1998 through 2004 is evidence of damages resulting from the alleged negligence of BB & C, and as such, it was appropriate evidence for this case and did not contribute to an improper windfall for Lite.

■■■■ BB & C also contends that Strauch's testimony was improperly admitted because it was speculative and because it had no basis in "reliable evidence." Appellant's Br. at 22.

It is a well-established principle that damages are awarded to fairly and adequately compensate an injured party for her loss, and the proper measure of damages must be flexible enough to fit the circumstances. In tort actions generally, all damages directly related to the wrong and arising without an intervening agency are recoverable. In negligence actions specifically, the injured party is entitled to damages proximately caused by the tortfeasor's breach of duty. In order for a negligent act to be a proximate cause of injury, the injury need only be a natural and probable result thereof; and the consequence be one which in light of the circumstances should reasonably have been foreseen or anticipated.

*Bader v. Johnson*, 732 N.E.2d 1212, 1220 (Ind.2000) (citations omitted).

■■■■ Lost profits are generally recoverable in malpractice actions, if they are ascertainable with a relative degree of certainty and based upon proper evidence. *See Serletic v. Noel*, 700 N.E.2d 1159, 1162 (Ind.Ct.App.1998). The law does not re-quire that lost profits be proven with mathematical certainty. *Uebelhack Equip., Inc. v. Garrett Bros. Inc.*, 408 N.E.2d 136, 140 (Ind.Ct.App.1980). In fact, less certainty is required to prove the amount of lost profits than is required to prove the fact that profits were lost. *Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind.App. 632, 652, 291 N.E.2d 92, 106 (1972), *reh'g denied and opinion modified on other grounds*, 154 Ind.App. 632, 294 N.E.2d 617 (1973). "Evidence of profits is not open to the objection of uncertainty where there is testimony which, while not sufficient to put the amount beyond doubt, is sufficient to enable the jury to make a fair and reasonable finding with respect thereto." *Id.* (citation omitted).

We considered this issue in *Insul–Mark Midwest, Inc. v. Modern Materials, Inc.*, 594 N.E.2d 459 (Ind.Ct.App.1992), *trans. granted and opinion adopted in relevant part*, 612 N.E.2d 550 (1993):

"Assuming, therefore, that profits prevented may be considered in measuring the damages, are profits to be divided into classes and kinds? Does the term 'speculative profits' express one of these classes, differing in nature from non-speculative profits? Do 'uncertain' profits differ in kind from 'certain' profits? The answer is assuredly, No. There is little that can be regarded as certain, especially with respect to what would have happened if the march of events had been other than it in fact had been. Neither court nor jury is required to attain 'certainty' in awarding damages; and this is just as true with respect to 'value' as with respect to 'profits.' ... The law requires that this evidence shall not be so meager or uncertain as to afford no reasonable basis for inference, leaving the damages to be determined by sympathy and feelings alone."

*Id.* at 467–68 (quoting Arthur L. Corbin, Corbin on Contracts § 1022, at 138–40 (1995)) (footnotes omitted).

There is no indication here that Lite's evidence of lost profits from 1998 through 2004 was "so meager or uncertain as to afford no reasonable basis for inference." *Id.* at 468. Strauch testified that he used professional accounting standards to calculate the 1998–2004 net lost profit estimations, the same standards that he used to calculate the 1992–1996 net lost profits for the *Techno* trial. The jury heard BB & C's objections to the evidence as being too speculative, and it heard Strauch's testimony as to how he arrived at the lost profit figures. Thus, the jury was able to weigh the evidence and even to disregard the evidence completely if it did not find Strauch's methods to be sufficiently reliable.

 As Lite points out, even if the lost profits evidence for 1998 through 2004 was admitted in error, it was harmless. A damage award will not be considered the result of improper considerations if the size of the award can be explained on any reasonable grounds. *Dee v. Becker,* 636 N.E.2d 176, 178 (Ind.Ct.App.1994). Here, the jury awarded Lite $3,612,574.00—less than the amount of the damages claimed by Lite for lost profits from 1992 through 1997. It is reasonable, then, to conclude that the jury awarded no damages to Lite for its claimed lost profits for the years 1998 through 2004, in which case any error in the admission of that evidence was harmless.

### V. Sufficiency of Evidence to Support Damages Award

 BB & C contends that there was insufficient evidence to support the jury's award of damages in the amount of $3,612,574.00. In our review of a damages award, we must not reweigh the evidence or judge the credibility of the witnesses, and we must consider only the evidence favorable to the award. *J.E. Stone Tree Serv., Inc. v. Bolger,* 831 N.E.2d 220, 227 (Ind.Ct.App.2005). We will reverse a verdict only when it is apparent from a review of the evidence that the amount of damages awarded is so great as to clearly indicate that the jury was motivated by prejudice, passion, partiality, corruption, or that it considered an improper element. *Dee,* 636 N.E.2d at 177. As noted above, if the jury's award can be explained on any reasonable ground, then it will not be deemed the result of improper considerations. *Id.* at 178.

According to BB & C, Lite failed to prove the amount of damages proximately caused by BB & C's alleged negligent representation. BB & C cites one case in which this Court reduced a jury award for consequential damages due to breach of warranty. *See Alderman Ford,* 154 Ind. App. 632, 291 N.E.2d 92. In that case, Bailey purchased a truck for $24,350.00 from Alderman Ford to be used in her gravel hauling business. She experienced ongoing problems with the truck's steering and returned it to Alderman Ford for repairs. The dealership did not return the truck for eight weeks, and Bailey presented evidence at trial that this delay caused her to lose approximately $6,100.00 in gross income. The jury awarded Bailey damages in the amount of $35,000.00, and Alderman Ford challenged the amount of the award on appeal.

In reviewing the jury's award, this Court considered that the jury could have reasonably found that the vehicle was totally worthless for Bailey's intended purpose and thus awarded her the entire purchase price, $24,350.00. Although the jury awarded Bailey an additional $10,650.00, presumably for lost profits, we revised this amount. We found that the evidence

showed a gross loss during the eight-week period of $6,100.00, which translated to a net loss of $3,200.00. We found that "[i]t would be wholly improper for a jury to project a past approximate weekly net profit into the future for an indefinite time and without evidence that such projection was at least reasonably certain." 154 Ind. App. at 654, 291 N.E.2d at 107. *Alderman Ford* is distinguishable from the instant case, where the total damages awarded to Lite can be explained on a "reasonable ground." *See Dee*, 636 N.E.2d at 178.

■ Here, the jury heard evidence of the *Techno* court's award and its order indicating that Lite's failure to mitigate affected the amount awarded. Also, an expert testified as to his calculations of Lite's lost profits and the professional standards that governed those calculations. Specifically, Strauch testified that Lite's lost profits from 1992 through 1996 were $2,609,608.00, its lost profits for 1997 were $902,997.00, its lost profits for 1998 through June 2004 were $5,750,000.00, and its lost profits resulting from BB & C's improper retention of the *Techno* trial judgment check amounted to $292,773.00. This evidence of estimated net lost profits in the amount of $9,555,378.00 was sufficient to support the jury's award of $3,612,574.00.

## VI. Collectibility of Judgment

■ Finally, BB & C contends that Lite's malpractice claim must fail because Lite did not show that a larger judgment would have been collectible from Techno. We agree that collectibility is an appropriate issue to consider when determining a malpractice plaintiff's actual damages, but who should bear the burden of proof? BB & C cites several cases from other jurisdictions[13] in support of its argument that Lite was required to show that a judgment in an amount greater than $260,000 would have been collectible from Techno.

BB & C urges us to adopt the position of the Seventh Circuit Court of Appeals, applying Illinois law, in *Klump v. Duffus*, 71 F.3d 1368 (7th Cir.1995), *cert. denied* (1996):

> In a malpractice action, a plaintiff's "actual injury" is measured by the amount of money she would have actually collected had her attorney not been negligent. A plaintiff is to be returned only to the same position she would have occupied had the tort not occurred.... Hypothetical damages above the amount that [the plaintiff] could genuinely have collected from [the defendant] are not a legitimate portion of her "actual injury;" awarding her those damages would result in a windfall.

*Id.* at 1374. BB & C fails to mention, however, that in *Klump*, the plaintiff had sued her attorney for negligence in failing to file her complaint within the statute of limitations period, thereby causing forfeiture of her $424,000.00 claim for damages. The intended defendant in the underlying case, however, was unemployed, had no assets with which to satisfy a judgment, and had only a $25,000 auto insurance policy. Thus, the Seventh Circuit reversed the jury's $424,000.00 award in Klump's favor and remanded the case for another trial in which evidence relevant to the judgment's collectibility would be admissible. *Id.* at 1375.

---

**13.** *See, e.g., Payne v. Lee*, 686 F.Supp. 677, 678 (E.D.Tenn.1988) (plaintiff must establish that but for negligence of attorney, the underlying lawsuit would have resulted in a collectible judgment); *Haberer v. Rice*, 511 N.W.2d 279, 285 (S.D.1994) (in malpractice claim, plaintiff must prove that judgment was collectible). BB & C also cites cases from Massachusetts, California, Minnesota, and Iowa in support of its collectibility argument.

Obviously, the law cited by BB & C on this issue is not controlling in the instant case. Also, *Klump* has significant factual differences that make the Seventh Circuit's reasoning unpersuasive here. While the malpractice plaintiff in *Klump* had been seeking a judgment against an individual with no apparent income and assets, Lite sought damages from Designatronics, a corporation that, in its own product catalog, states:

> You're in good company with [Designatronics]. We're specialists in manufacturing and marketing over 80,000 automation and drive components (inch and metric). Most of them are available from stock and are featured in comprehensive catalogs which are available to you through each of the following [Designatronics] companies.

Appellee's App. at 466. The catalog, which was admitted at trial, lists four Designatronics companies, including Techno. *Id.* Certainly, the jury could have reasonably inferred that a corporation on the apparent scale of Designatronics would have the resources to satisfy a multi-million dollar judgment. Further, BB & C offered no evidence suggesting that Designatronics could not have paid a judgment greater than $260,000.00.

As Lite points out, several courts in other jurisdictions treat collectibility as an affirmative defense that must be pleaded and proved by the defendant. *See; e.g., Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 31 (Alaska 1998); *Jourdain v. Dineen,* 527 A.2d 1304, 1306 (Me.1987); *Kituskie v. Corbman,* 552 Pa. 275, 714 A.2d 1027, 1032 (1998). The Alaska Supreme Court explained this approach as follows:

> Because the need to determine collectibility is caused by professional negligence, and the requirement of proving collectibility arises only after malprac-

tice has been proved, policy would seem to militate in favor of requiring the malpracticing attorney to bear the inherent risks and uncertainties of proving uncollectibility. Practicality seems to point to the same conclusion: there is no good reason to presume from a record silent on the issue of collectibility that the underlying judgment at issue would not eventually be collected.

*Power Constructors, Inc.,* 960 P.2d at 31–32. Other courts adopting this position have noted that to hold the plaintiff responsible for proving collectibility would be to ignore the possibility of settlement between the plaintiff and the underlying tortfeasor and to overlook that the passage of time itself can affect collectibility of the underlying case. *Smith v. Haden,* 868 F.Supp. 1, 2 (D.C.1994), *aff'd by* 69 F.3d 606 (D.C.Cir.1995).

■ We agree that it makes more sense to place the burden of proof upon the malpractice defendant to show that the judgment would not have been collectible from the defendant in the underlying case. Here, BB & C did not present any evidence of uncollectibility. It did not object to the jury instruction setting forth the elements required to prove malpractice under Indiana law, which made no mention of collectibility. Further, there was evidence in the record that would have allowed a reasonable jury to make inferences regarding Techno's size and assets, i.e., its ability to satisfy a multimillion-dollar judgment. We thus conclude that if collectibility was to be a valid issue in this case, then BB & C was required to raise it.

## VII. Prejudgment Interest

On cross-appeal, Lite argues that the trial court erred in denying its claim for prejudgment interest. Lite claims that Indiana common law establishes its right to prejudgment interest and that BB & C's

counsel conceded Lite's right to prejudgment interest at a pre-trial hearing. On the other hand, BB & C argues that Lite waived the issue of BB & C's concession. BB & C also claims that Lite did not satisfy the statutory requirements necessary to collect a prejudgment interest award. *See* Ind.Code §§ 34–51–4–1 to –9.

We address the concession issue first. On May 19, 2004, during a hearing regarding pre-trial matters such as motions in limine and Judge Johnson's deposition, the trial court asked counsel for BB & C about his client's concerns regarding the speculative nature of Lite's alleged damages. In response, BB & C's counsel stated, in pertinent part,

> [I]n this particular case, if [Lite is] right, and [BB & C] should have recovered the 2.6 (million dollars) and the 1.3 (million dollars) and everything, they will get pre-judgment, they will get interest on that from the date in which the judgment should have been entered, January whatever it was, 1998, on that. That's a compensable item of damages. I don't have a problem with that.

Appellee's App. at 488.

■ On June 21, 2004, Lite filed its motion for prejudgment interest, postjudgment interest, and costs. That motion reads, in pertinent part,

> The damages resulting to Lite Machines, as a result of the difference between the amount of damages found by the Techno court and the amount of damages actually awarded in the Techno Case, were complete and ascertainable at the time of the underlying judgment. The trial court in the Techno Case expressly found: "Projected net income for Lite over five (5) years was $2,409,435; actual net loss was $200,173, for a difference of $2,609,608." (Finding of Fact No. 280). Because it determined that plaintiff failed to miti-

gate its damages, the court reduced the award to $260,000. Thus, Lite Machines' damages in the amount of $2,349,608 were complete and ascertainable at the time of judgment in the Techno Case. Determining this amount requires only a simple mathematical calculation ($2,609,608—$260,000 = $2,349,608). Accordingly, Lite Machines is entitled to prejudgment interest on this amount.

*Id.* at 2 (citation omitted). Lite did not mention BB & C's "concession" in its motion. On June 23, 2004, BB & C filed its response in opposition to Lite's motion, and on July 1, 2004, BB & C filed its sur reply brief in opposition to Lite's motion. On July 13, 2004, the trial court denied Lite's motion for prejudgment interest. When Lite filed its motion to correct error on July 26, 2004, it raised the concession issue for the first time, citing BB & C's counsel's statement at the pretrial hearing. *Id.* at 10.

■ Generally, a party may not raise an issue for the first time in a motion to correct error. *Troxel v. Troxel*, 737 N.E.2d 745, 752 (Ind.2000). Lite was present at the hearing when BB & C's counsel made the statement at issue, and Lite offers no explanation as to why it failed to mention the statement in its motion for prejudgment interest. Thus, we agree that the concession issue is waived.

■ Also, we note that Lite argues its right to prejudgment interest solely under a common law theory. BB & C contends that Lite did not adhere to the requirements of the Tort Prejudgment Interest Statute (the "TPI Statute") and thus cannot recover such interest. In support of its argument that the common law applies here, Lite points to a case from the early 1900s, *New York, Chicago & St. Louis Railway Company v. Roper*, 176 Ind. 497,

96 N.E. 468 (1911). In *Roper*, our supreme court considered whether a tort claimant was entitled to interest on his judgment against a railroad for damages to his house. At that time, the Indiana statute regulating interest addressed only those judgments arising out of contract disputes. The Court found that because the statute was silent as to tort cases, interest in a tort case could be recovered, not as interest per se, but rather as part of the damages sustained by a tort plaintiff.

In two recent cases, we have held that the TPI Statute preempts a tort claimant's right to recover prejudgment interest under the common law. *See Simon Property Group, L.P. v. Brandt Construction, Inc.*, 830 N.E.2d 981, 994 (Ind.Ct.App.2005), *trans. denied* (2006); *Gregory & Appel*, 835 N.E.2d at 1065. Lite argues that the *Simon* and *Gregory & Appel* decisions are based on "faulty reasoning" and that the purpose of the TPI statute is to "create[ ] rights in addition to those available under the common law." Appellee's Reply Br. at 3.

In *Simon*, we noted that the opening provision of the TPI statute states that "[t]his chapter applies to any civil action arising out of tortious conduct." *Simon*, 830 N.E.2d at 994 (quoting Ind.Code § 34–51–4–1). We also looked to our prior determination that the TPI Statute's purpose is to encourage settlement and to compensate plaintiffs for the lost time value of money. *Id.* (citing *Johnson v. Eldridge*, 799 N.E.2d 29, 33 (Ind.Ct.App.2003), *trans. denied*). We concluded that the legislature enacted the TPI Statute with the intent that it would preempt common law prejudgment interest in tort cases. *Id.* To hold otherwise, we stated, "would be to render the [TPI] statute and its requirements virtually meaningless—a party who failed to fulfill the statute's requirements

could merely turn to the common law for relief." *Id.*

In *Gregory & Appel*, we reached the same conclusion. In addition to the authority cited by the *Simon* court, we made the following analysis:

[It is our presumption that] the legislature does not intend by the enactment of a statute to make any change in the common law beyond what it declares, either in the common law beyond what it declares, either in express terms or by unmistakable implication. An abrogation of the common law will be implied (1) where a statute is enacted which undertakes to cover the entire subject treated and was clearly designed as a substitute for the common law; or (2) where the two laws are so repugnant that both in reason may not stand.

*Irvine v. Rare Feline Breeding Ctr.*, 685 N.E.2d 120, 123 (Ind.Ct.App.1997) (citation and quotation marks omitted), *trans. denied* (1998). It is apparent to us that Indiana Code 34–51–4 covers the entire subject of the conditions for awarding prejudgment interest in tort cases and was clearly designed as a substitute for the common law. We find support for our conclusion not only in the plain language of the statutes themselves, but also in *Roper*, in which the court noted that Indiana's then-existing interest statute dealt only with contract matters and acknowledged that 'if the allowance of interest in this case depends on the provisions of our statute, appellant's contention [that prejudgment interest should not have been awarded] must prevail.' 176 Ind. at 505, 96 N.E. at 471. Because the suit was in tort however, the common law rule prevailed. With the Prejudgment Interest Act, that is no longer the case today.

*Gregory & Appel*, 835 N.E.2d at 1065.

At oral argument, Lite cited three additional Indiana cases in support of its argu-

ment that the TPI Statute and the common law regarding prejudgment interest can and should coexist. We note, however, that all of these cases were decided long before the TPI Statute was enacted and are therefore unpersuasive. Despite Lite's opinion that this Court's reasoning was "faulty" in the *Simon* and *Gregory & Appel* cases, we stand by their reasoning as well as their conclusion that the TPI Statute trumps common law.

Because Lite failed to meet the requirements of the TPI Statute,[14] it cannot recover prejudgment interest in this case. Thus, the trial court did not err in denying Lite's motion for prejudgment interest.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.

---

14. Neither party identifies the specific provision(s) of the TPI Statute with which Lite failed to comply. However, Lite does not dispute BB & C's claims that it indeed failed to comply, and Lite does not attempt to recover prejudgment interest under the TPI Statute.