

FILED

Apr 22 2015, 9:36 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

David T. Kasper
Julia Blackwell Gelinas
Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Jon R. Pactor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Timothy Devereux,

*Appellant/Cross-Appellee/Defendant,*

v.

Jim and Diana Love,

*Appellees/Cross-Appellants/Plaintiffs*

April 22, 2015

Court of Appeals Case No.
49A02-1404-CT-260

Appeal from the Marion Superior Court
The Honorable Patrick L. McCarty, Judge
Cause No. 49D03-1209-CT-35875

**Bradford, Judge.**

## Case Overview

[1] One of the blocks of the foundation of America is an individual's ability to seek to right a wrong through the courts of justice. In a civil case, a plaintiff entrusts his plight and cause to his attorney. The instant matter involves the disturbing tale of a husband and wife whose confidence and trust was betrayed by the very

attorney to which they had entrusted their cause of action. The just and normal inclination in such a matter is to punish the wrongdoer and make the victims whole. While William Conour, *i.e.*, the wrongdoer, has been punished and now occupies his appropriate place in federal prison, to date, it appears that these victims have not been made whole for the misdeeds inflicted upon them.

[2] In an attempt to redress this wrong, Appellees/Cross-Appellants/Plaintiffs Jim and Diana Love (collectively, the "Loves") now seek relief from Appellant/Cross-Appellee/Defendant Timothy Devereux, a former member of Conour's law practice. However, in light of the facts of this particular case, we find that Devereux satisfied his legal duty to the Loves based on his lack of knowledge of any specific wrongdoing by Conour relating to the Loves. We therefore reverse the judgment of the trial court in this regard and remand the matter to the trial court with instructions that the trial court grant summary judgment in favor of Devereux.

## Facts and Procedural History

### I. William Conour, the "Wrongdoer"

[3] On April 27, 2012, William Conour "was charged by criminal complaint in the United States District Court for the Southern District of Indiana with misappropriating client funds in violation of 18 U.S.C. § 1343." *Minnesota Lawyers Mut. Ins. Co. v. Conour*, No. 1:12-CV-1671-WTL, 2014 WL 5089290, at *1 (S.D. Ind. Oct. 8, 2014). "The complaint alleged, in part, that Conour ran a so[-]called 'Ponzi scheme' with clients' settlement funds and converted a large

portion of those settlement funds to his own use and benefit." *Id*. "Shortly thereafter, the Disciplinary Commission of the Supreme Court of Indiana instituted disciplinary proceedings against Conour." *Id*. "Conour eventually resigned from the Indiana Bar." *Id*. On June 29, 2012, the Indiana Supreme Court issued a published order accepting Conour's resignation from the Indiana Bar. *In re Conour*, 969 N.E.2d 1008 (Ind. 2012). On August 13, 2012, the United States Supreme Court issued an order suspending Conour from practicing law before the Court. *In re Discipline of Conour*, 133 S. Ct. 88 (2012).

[4]     On July 15, 2013, Conour pled guilty to one count of wire fraud. During his change of plea hearing, he admitted that:

> Beginning as early as 1999 and continuing through April 2012, in Hamilton and Marion Counties and elsewhere in the Southern District of Indiana, [he] ... knowingly devised and participated in a scheme to defraud and to obtain money and funds from his clients and others by means of materially false and fraudulent pretenses, representations, and promises ...

> It was part of the scheme that after receiving settlement funds on behalf of some clients, [he] convinced the clients to accept monthly payments over a period of years rather than to accept a lump sum payment. [He] created trust accounts for the clients through State Bank & Trust, doing business as Reliance Financial Services, and Ohio Financial Institution, to facilitate the monthly payments. Rather than depositing the entire amount of settlement funds with Reliance, [he] funded the trusts only on a yearly basis, thereby unlawfully keeping for his own use and benefit the bulk of the settlement proceeds totaling more than $3 million.

> It was further part of the scheme that after receiving settlement funds on behalf of some clients, [he] failed to notify the clients that he had received settlement funds on

their behalf, and in some cases falsely denied that he had received any settlement funds. Thereafter, [he] unlawfully converted the settlement funds to his own use and benefit and, in part, used the settlement funds obtained for some clients to make settlement payments to other clients.

It was further part of the scheme that [he] stole, misappropriated, and unlawfully converted to his own use more than $4,500,000 belonging to more than 25 clients. On or about October 6, 2011, in the Southern District of Indiana and elsewhere, [he], for the purpose of executing the above-described scheme, knowingly caused to be transmitted in interstate commerce, by wire communication, certain writings, signs, and signals, namely a facsimile transmission from his office in Indianapolis, Indiana to Zurich American Insurance in New Jersey, which contained [a client's] release and indemnification agreement.

Dkt. No. 155–5 at 12–14. Conour was thereafter sentenced to 120 months in prison and ordered to pay restitution to the client-victims.

*Conour*, No. 1:12-CV-1671-WTL, 2014 WL 5089290, at *1-2.

# II. Conour's Representation of the Loves

On May 13, 2008, Jim was injured at work. A few months later, in August of 2008, the Loves hired Conour Law Firm (the "Firm") to represent them in a personal injury lawsuit against Meyer & Najem Construction, LLC. Unfortunately, the Loves subsequently became victims of Conour's above-described illegal acts when he settled their personal injury lawsuit without their knowledge in February of 2012.

# III. Devereux's Representation of the Loves and the Termination of Devereux's Employment at the Firm

## A. Events Occurring Prior to December of 2011

In February of 2008, Devereux joined the Firm as an Associate Attorney. Devereux was subsequently assigned, by Conour, to work with Conour on the Loves' personal injury case.

In early July of 2010, the Loves received a letter dated July 1, 2010, which read as follows:

> We are pleased to introduce you to the new law firm of Conour Devereux Hammond[1] which is taking over the cases and business of Conour Law Firm, LLC. Of course, you already know all of us because we have been working with you on your case since its beginning. Your existing contract with the Conour Law Firm will be fully honored by the new firm and we are continuing to represent you as your attorneys.
>
> Conour Devereux Hammond will represent you in the same professional and excellent manner as the Conour Law Firm. However, upon the formation of a new law firm, even though it may include the same lawyers as the previous law firm, we are required by the Indiana Rules of Professional Conduct for Attorneys to give you the option of selecting other counsel to represent you.
>
> We presume you will want us to continue as your attorneys and, if that is true, then you do not have to respond to this letter; but if you do wish to find other counsel you must notify us within ninety (90) days of the date of this letter.

---

[1] We will continue to refer to this new firm as the "Firm."

> We look forward to continuing to work with you to the conclusion of your claim. If you have any questions or wish to discuss this matter, please call any one of us. Thanks.

Appellant's App. p. 67.[2] The letter was signed by Conour, Devereux, and Jeffrey Hammond. Despite the July of 2010 change of the Firm name to include Devereux's name, Devereux subsequently averred, without contest, that he never had any ownership interest in the Firm, that he was never a signatory on any of the Firm's bank accounts, and was not provided access to any of the Firm's financial records.

## B. Events Occurring During December of 2011

[8] At some point in December of 2011, Devereux decided to terminate his employment with the Firm due to concerns he had regarding Conour's failure to timely pay expenses and expert witness fees, which was hampering Devereux's ability to adequately and timely prepare cases for trial in cases other than the Loves' matter. In addition, on December 21, 2011, after deciding to leave the Firm, Devereux became aware that a Case Verification Report, which had been prepared by Conour and sent to Advocate Capital,[3] contained inaccurate and misleading information. Also on December 21, 2011, Devereux

---

[2] It appears that the Loves elected to stay with the Firm as Devereux and Conour continued to represent the Loves in their personal injury case.

[3] It appears that Advocate Capital is a company that had a financial interest in certain of the Firm's cases because it advanced litigation expenses to the Firm for said cases.

became aware that Conour had not delivered the settlement proceeds from a wrongful death case to a client, the settlement for which had been approved by the trial court in early June of 2011.

[9] Devereux resigned from his position of employment with the Firm on December 22, 2011. On this date, Devereux delivered a letter to Conour which read: "I am terminating my employment with your law firm effective December 22, 201[1].… In addition, please remove me from the firm's name immediately including but not limited to the firm's letter head, the firm's website, all signage at the office and all marketing materials." Appellant's App. p. 120.

[10] Devereux averred that based upon his experience with the Firm, "whenever an attorney left their employment with the Firm, the Firm would prepare and file Withdrawals of that attorneys [sic] Appearance on all of the Firm's cases." Appellant's App. p. 111. Devereux further averred that he "saw this practice occur firsthand after both John Daly and Jeffrey Hammond left their employment as attorneys with the [Firm]." Appellant's App. p. 111. Devereux also averred that it was his understanding that, upon his resignation, the Firm did prepare and file withdrawals of his appearance on all of the Firm's cases and that he was advised by the office staff at the Firm that the withdrawals of his appearance had, in fact, been prepared shortly after he resigned.

[11] On December 23, 2011, Conour informed the Loves, via letter, that Devereux was "no longer an employee with [Conour's] law firm." Appellant's App. p. 101. The December 23, 2011 letter further stated:

Not always, but occasionally when an attorney leaves a law firm he or his new employer may contact the law firm's clients to try to convince the client to let the attorney take their file rather than leave it with the law firm they were referred to in the first place. I don't know if Mr. Devereux will attempt to contact you to take your case, but he might. You are not to be contacted in person or by phone but only by letter should he attempt to contact you. You have the choice to remain with me in my firm where you were first referred or to have your file sent to Mr. Devereux whenever he finds new employment or to have your file sent to a new attorney. Of course, I think it is in your best interest to remain with me since we have handled your case from the beginning and you were referred to me and no one else.

For your convenience I have enclosed a form for you to indicate whether you wish me and my firm to remain your attorneys or if you want your file sent to Mr. Devereux or some other attorney. I have also enclosed a stamped, self-addressed envelope for returning the dated and signed form to me. I am sorry to bother you with this during the holiday season but it is best to get this settled immediately so we do not have any gaps in your legal representation.

Appellant's App. p. 101. The Loves subsequently signed the form indicating that they wished for Conour and the Firm to continue to represent them.

[12] After leaving the Firm, Devereux joined the law firm of Ladendorf & Ladendorf. On December 29, 2011, Devereux sent a letter to the Loves in which he informed them that he was no longer employed by the Firm. The December 29, 2011 letter also stated the following:

I am pleased to let you know that Julie Durbin and I have joined the law firm of Ladendorf & Ladendorf in Indianapolis, Indiana. Ladendorf & Ladendorf is a well-respected firm with an excellent reputation of experience, commitment, dedication and aggressive representation of its clients. We are very excited about this opportunity and the ability to continue working together. We are also very interested in continuing to represent you on your case. As you

know, we have been involved in the preparation and prosecution of your case.

Under Indiana law, you have the absolute right to use the attorney of your choice and I would be glad to continue to represent you in the future should you wish. In the event that you do chose to have me continue to represent you with the assistance of Julie, the amount of the attorney fees set forth in the original Attorney Fee Agreement will remain the same. You need only send a letter to the Conour Law Firm advising it that you have chosen to have me continue to represent you on your case along with Julie's assistance.

On behalf of Julie and myself, it has been a privilege and a pleasure getting to know you and we look forward to continuing to work with you on your case in the future. Should you have any questions or concerns regarding your choice, please feel free to contact Julie or me at your convenience.

Appellant's App. p. 126. Devereux received no response from the Loves regarding the December 29, 2011 letter.

## C. Events Occurring After December of 2011

On January 20, 2012, Devereux received an email from Conour in which Conour informed him that other than a few specifically named clients, the remainder of the clients had chosen to remain with the Firm. Conour also instructed Devereux to have no further contact with clients represented by Conour or the Firm. The Loves were not one of the specifically mentioned clients, but rather were among the group of clients that had chosen to remain with the Firm.

Sometime in early April of 2012, Devereux was contacted by the clerk of Hendricks County Superior Court 4 regarding an upcoming pre-trial conference

that was scheduled in the Loves' case. Devereux averred that this contact was when he first learned that the Firm had not filed his withdrawal in the Loves' case. Devereux immediately filed a request to withdraw his appearance in the Loves' case.

# IV. Devereux's Cooperation with the Indiana Supreme Court Disciplinary Commission (the "Disciplinary Commission") and the Federal Bureau of Investigation (the "FBI")

On December 27, 2011, Devereux contacted the Indiana Supreme Court Disciplinary Commission (the "Disciplinary Commission") to request a meeting regarding his concerns relating to Conour. On December 30, 2011, Devereux submitted a letter to the Disciplinary Commission setting forth his concerns regarding Conour. Devereux also repeated his request for a meeting with the Disciplinary Commission to discuss his concerns.

On January 9, 2012, Devereux was contacted by Special Agent Doug Kasper of the FBI and was asked to assist the FBI in an ongoing investigation of Conour. That same day, Devereux met with Special Agents Kasper and Andrew Shank and learned that the FBI was investigating Conour for failing to properly fund annuities for clients arising out of personal injury settlements generated by cases handled by the Firm. Devereux subsequently met with Special Agents Kasper and Shank several times over the next two-to-three weeks and assisted them in their investigation. Devereux averred that to his knowledge, the conduct being

investigated by the FBI related only to the funding of structured settlements and did not involve any other potential wrongdoing.

[17] Devereux met with Michael Witte and Robert Shook of the Disciplinary Commission on January 10, 2012. During this meeting, Devereux reported his concerns regarding Conour as were outlined in his December 30, 2011 letter. Devereux also shared the information that he had learned from his meeting with FBI Special Agents Kasper and Shank the day before regarding the FBI's suspicions that Conour was not properly funding clients' annuities.

[18] On February 24, 2012, Devereux became aware that Conour had settled a case without the clients' knowledge after he contacted the insurance adjuster assigned to the case to inform the adjuster that he was taking over from the Firm. During the conversation, the adjuster informed Devereux that Conour had settled the case in October of 2011, that the adjuster had received a signed release from Conour, and that the settlement draft of $450,000.00 had been deposited by Conour in October of 2011. The adjuster emailed Devereux a copy of the release provided to him by Conour and a copy of the cancelled check.

[19] Later that day, Devereux met with the clients and showed them the documentation provided by the adjuster. The clients confirmed that they had never seen or signed the release in question and had never given Conour authority to settle their claim. The clients further confirmed that they had never been informed by Conour that their case had been settled or received any

settlement payment. After speaking with the clients, Devereux contacted both the FBI and the Disciplinary Commission to report the newly learned information.

## V. Devereux Notified that Conour Settled the Loves' Case Without Their Consent

[20] On July 20, 2012, the Loves' current counsel sent Devereux a letter informing him that Conour had settled the Loves' case in February of 2012, without the Loves' consent or knowledge, for the sum of $120,000. The letter indicated that the settlement check was dated February 9, 2012, that Conour deposited the check into his IOLTA trust account, and that the check cleared on February 9, 2012. The letter further indicated that Conour asked the Loves to sign a settlement disbursement sheet in May of 2012, but that they had not, to date, received any settlement funds.

[21] The July 20, 2012 letter also asserted that Devereux, in his position as one of the Loves' counsel of record, had a duty to inform the Loves of his knowledge that Conour "was in serious ethical and criminal predicaments and that the Loves were in peril of being victimized." Appellant's App. p. 129. The letter alleged that Devereux had breached this duty and threatened Devereux with a malpractice action if he did not pay the Loves the proceeds of the settlement "that they should have received and for the proceeds that may not have been paid to third parties such as lien holders." Appellant's App. 129.

Devereux subsequently responded to the July 20, 2012 letter. In his response, Devereux stated that at the time he terminated his employment with the Firm, he "had no reason to know, did not know and could not have known that [Conour] would settle a client's case without their knowledge and then keep the settlement proceeds for himself." Appellant's App. p. 111. Devereux also asserted that (1) he did not owe the claimed duty to the Loves as, at the time he terminated his employment with the Firm, he did not have knowledge that Conour was facing serious ethical and criminal predicaments that would place the Loves at peril for being victimized; and (2) any duty owed to the Loves was extinguished when his representation of the Loves ended when he terminated his employment at the Firm.

In making these assertions, Devereux indicated that he had no access to any part of the Loves' case file or materials after he terminated his employment at the Firm on December 22, 2011, and that he had not had any involvement in the Loves' case since that date. Devereux further indicated that he was not aware of and did not participate in the February 2012 settlement of the Loves' case, was not copied on any correspondence between the Firm and counsel for the defendant, and was not aware that the Loves' case had been settled by the Firm until he was contacted by the Loves' current counsel on July 20, 2012.

## VI. Procedural History

On September 12, 2012, the Loves filed an action against Devereux. In their Amended Complaint, the Loves alleged that Devereux had breached certain

duties owed to them by not informing them of his suspicions regarding Conour's conduct when Devereux terminated his employment at the Firm. The parties subsequently filed competing motions for summary judgment. The Loves and Devereux both filed motions to strike certain affidavits submitted by the other party. On February 10, 2014, following a hearing, the trial court denied the parties' competing motions for summary judgment and motions to strike.

Devereux subsequently requested that the trial court certify its interlocutory order for appeal. On March 17, 2014, the trial court certified its February 10, 2014 order for interlocutory appeal over the Loves' objection. On May 23, 2014, we granted Devereux's motion to accept jurisdiction of interlocutory appeal. This interlocutory appeal follows.

# Discussion

## I. Summary Judgment

### A. Standard of Review

Pursuant to Rule 56(C) of the Indiana Rules of Trial Procedure, summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. *Heritage Dev. of Ind., Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 887 (Ind. Ct. App. 2002).

"On appeal from the denial of a motion for summary judgment, we apply the same standard applicable in the trial court. Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). We therefore must determine whether the record reveals a genuine issue of material fact and whether the trial court correctly applied the law. A genuine issue of material fact exists where facts concerning an issue, which would dispose of the litigation are in dispute, or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. If the material facts are not in dispute, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts. When there are no disputed facts with regard to a motion for summary judgment and the question presented is a pure question of law, we review the matter de novo."

*Clary v. Lite Machines Corp.*, 850 N.E.2d 423, 430 (Ind. Ct. App. 2006) (quoting *Bd. of Tr. of Ball State Univ. v. Strain*, 771 N.E.2d 78, 81-82 (Ind. Ct. App. 2002) (internal quotation marks and some citations omitted)).

[27] "'In reviewing cross-motions for summary judgment, we consider each motion separately.'" *Alva Elec., Inc. v. Evansville-Vanderburgh Sch. Corp.*, 7 N.E.3d 263, 267 (Ind. 2014) (quoting *Girl Scouts of S. Ill. v. Vincennes Ind. Girls, Inc.*, 988 N.E.2d 250, 253 (Ind. 2013)).

A party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *American Management, Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424, 428 (Ind. Ct. App. 1996). Once the moving party satisfies this burden through evidence designated to the trial court pursuant to Trial Rule 56, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. *Id*.

*Heritage Dev.*, 773 N.E.2d at 888. "On appeal, the trial court's order granting or denying a motion for summary judgment is cloaked with a presumption of validity." *Van Kirk v. Miller*, 869 N.E.2d 534, 540 (Ind. Ct. App. 2007), *trans. denied*. However, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment but rather may affirm the trial court's ruling if it is sustainable on any theory found in the evidence designated to the trial court. *See Alva Elec.*, 7 N.E.3d at 267 (citing *Wagner v. Yates*, 912 N.E.2d 805, 811 (Ind. 2009)).

## B. Analysis

### 1. Overview of Relevant Authority Relating to the Duty Owed By an Attorney to a Client

[28] "Under Indiana Law, the elements of legal malpractice are: (1) employment of an attorney, which creates a duty to the client; (2) failure of the attorney to exercise ordinary skill and knowledge (breach of the duty); and (3) that such negligence was the proximate cause of (4) damage to the plaintiff.'" *Van Kirk*, 869 N.E.2d at 541 (quoting *Clary*, 850 N.E.2d at 430). "A defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim." *Clary*, 850 N.E.2d at 430. "'Proximate cause requires that there be a reasonable connection between the defendant's allegedly negligent conduct and the plaintiff's damages. Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct.'" *Id.* (quoting *Gates v. Riley ex rel. Riley*, 723 N.E.2d 946, 950 (Ind. Ct. App. 2000) (internal citations omitted)).

The existence of a duty is generally a question of law for the court to decide. *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003). Where an alleged duty is well established, there is no need for a judicial redetermination of duty. *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1053 (Ind. 2003). Whether a particular act or omission amounts to a breach of an attorney's duty is generally a question of fact for the jury. [*Oxley v. Lenn*, 819 N.E.2d 851, 856 (Ind. Ct. App. 2004)]. However, breach can become a question of law where the facts are undisputed and only a single inference can be drawn therefrom. *Id.*

*In re Estate of Lee*, 954 N.E.2d 1042, 1046-47 (Ind. Ct. App. 2011).

It is a basic principle of professional conduct that an attorney must faithfully, honestly, and consistently represent the interest and protect the rights of his client, and that he is bound to discharge his duties to his client with the strictest fidelity, to observe the highest and utmost good faith, and to inform his client promptly of any known information important to him.

*Blasche v. Himelick*, 140 Ind. App. 255, 260, 210 N.E.2d 378, 381 (1965) (internal quotation omitted).

Again, in order to succeed in a legal malpractice claim, the plaintiff must prove, among other things, that the attorney breached his duty to the client. *Van Kirk*, 869 N.E.2d at 544 (citing *Clary*, 850 N.E.2d at 432). In Indiana, an attorney is generally required to "'exercise ordinary skill and knowledge.'" *Id.* (quoting *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996)). An attorney also has a duty to protect and preserve the rights and property of his client. *In re Estate of Lee*, 954 N.E.2d at 1047. In addition, an attorney "owes his client a duty, when withdrawing from representation, to withdraw in the manner least harmful to

the client in order to protect the client's interests." *Bell v. Clark*, 653 N.E.2d 483, 490 (Ind. Ct. App. 1995).

## 2. Application of the Relevant Authority to the Instant Matter

### i. Potential Breach Committed Prior To and at the Time of Devereux's Departure from the Firm

[32] As is set forth above, the instant matter involves deceit and theft of client funds by Conour, who, at the time, was a highly-respected member of the Indiana legal profession. Hindsight proves that Conour was not worthy of this high level of respect but, rather, was a thief who violated the trust and confidences that numerous clients, including the Loves, had placed in him. In reviewing the claims of legal malpractice set forth herein against Devereux, however, we must not view the matter through the lens of hindsight, but rather must look to what Devereux knew at the time he is alleged to have committed legal malpractice by failing to warn the Loves of Conour's potential wrongdoing.

[33] Devereux acknowledges that he had a duty to exercise ordinary skill and knowledge in relation to his representation of the Loves while serving as one of their counsel of record. Devereux contends, however, that his decision not to discuss his concerns regarding Conour with the Loves did not amount to a breach of this duty. We agree.

[34] The designated evidence indicates that Devereux decided to leave the Firm prior to December 21, 2011, because Conour was failing to pay expenses and expert witness fees in a timely fashion and the delay was "causing problems"

with his ability to prepare cases for trial. Appellant's Br. p. 13. After making this decision, but prior to ending his employment with the Firm, Devereux subsequently learned the following: (1) the Firm had not promptly remitted attorney's fees to a law firm that had served as co-counsel on a case that had settled earlier that year; (2) the Firm had not delivered settlement proceeds to a client from the client's wrongful death case, in which the settlement proceeds had been approved for distribution several months earlier; and (3) Conour had prepared, signed, and faxed a case verification report to Advocate Capital that contained inaccurate and misleading information relating to certain cases.

[35] In arguing that he did not breach any duty owed to the Loves, Devereux claims that it would have been inappropriate for him to share his concerns regarding Conour with the Loves at the time he ended his employment with the Firm. We agree.

[36] The designated evidence reveals that although Devereux had concerns about some of Conour's actions relating to the operation of the firm, at that time, Devereux's suspicions related only to what he classified as poor business practices. Devereux only knew that Conour had failed to pay expert witnesses and co-counsel in a timely fashion, and had failed to provide an accurate up-to-date accounting of the Firm's active cases to Advocate Capital. The designated evidence further reveals that Devereux did not have access to the Firm's financial records, and did not know if there was a reasonable explanation for the delayed payments of the settlement proceeds which had yet to be distributed.

[37] The designated evidence also supports Devereux's assertions that he did not have any specific knowledge (1) of any wrongdoing by Conour relating to the Loves, (2) that Conour was mishandling any active cases, or (3) of any wrongdoing by Conour other than delaying payments. Review of the designated evidence reveals that Devereux did not learn that Conour had settled a client's claim without the client's permission or knowledge until February 24, 2012, and did not learn that Conour had settled the Loves' case without their permission or knowledge, until July of 2012.

[38] The designated evidence outlining Devereux's knowledge at the time he terminated his employment from the Firm is insufficient to create an issue of material fact with regards to whether Devereux knew, or even should have known, that Conour would breach the trust instilled in him by his clients by stealing client funds. Again, whether a particular act or omission amounts to a breach of an attorney's duty is generally a question of fact for the jury. *In re Estate of Lee*, 954 N.E.2d at 1047 (citing *Oxley*, 819 N.E.2d at 856). "However, breach can become a question of law where the facts are undisputed and only a single inference can be drawn therefrom." *Id*. (citing *Oxley*, 819 N.E.2d at 856). Devereux claims that the record demonstrates that he acted appropriately and satisfied his duty to exercise ordinary skill and knowledge in relation to his representation of the Loves by subsequently initiating contact with the Disciplinary Commission regarding his concerns about Conour. Our review of the designated evidence submitted by the parties lead us to conclude that the designated evidence only allows for a single inference to be drawn, that

inference being that Devereux did not breach any duty that he owed to the Loves prior to or at the time he terminated his employment with the firm.

[39] Furthermore, while we observe that William Harrington, an attorney who has been licensed to practice law in Indiana since 1989, opined that Devereux violated the duty he owed to the Loves, Harrington's opinion was formulated on the unsupported assumption that Devereux had knowledge that Conour "may have been a thief of money belonging to clients and others." Appellant's App. p. 44. As is stated above, the designated evidence is insufficient to prove that Devereux "knew" that Conour was potentially stealing money from clients or others at the time Devereux left the firm. Accordingly, we cannot say that Harrington's affidavit created an issue of material fact as to whether Devereux breached any duty he may have owed to the Loves.

### ii. Potential Breach Committed Upon Devereux's Departure from the Firm

[40] The Loves also argue that Devereux breached his duty by failing to withdraw his representation in the least harmful manner possible. Specifically, the Loves claim that Devereux violated his duty to them because he failed to warn the Loves of Conour's wrongdoings despite the fact that he did not officially withdraw as an attorney of record until April of 2012, by which time he knew or should have known of the expansive scope of Conour's wrongdoings. We cannot agree.

[41] The designated evidence reveals that by the time Devereux learned that Conour had mishandled active cases, Devereux had not served as the Loves' attorney

for nearly two months. Importantly, Jim admitted that as of December 29, 2011, he knew that Devereux was no longer his attorney. Jim's admission undercuts his and Diana's claim on appeal that Devereux remained their attorney or retained some duty to them after he left the firm. As such, in this regard, we conclude that no issue of material fact remains that would preclude an award of summary judgment in favor of Devereux.

## II. Denial of the Loves' Motion to Strike Expert Affidavit Tendered by Devereux

[42] The Loves also contend that the trial court erred in denying their motion to strike the expert affidavit tendered by Devereux. A trial court has broad discretion in granting or denying a motion to strike. *Auto-Owners Ins. Co. v. Bill Gaddis Chrysler Dodge, Inc.*, 973 N.E.2d 1179, 1182 (Ind. Ct. App. 2012) (citing *Coleman v. Charles Court, LLC*, 797 N.E.2d 775, 786 (Ind. Ct. App. 2003)). The trial court's decision will not be reversed unless prejudicial error is clearly shown. *Id.* (citing *Coleman*, 797 N.E.2d at 786). Further, this court has previously concluded that expert testimony is generally required to establish the applicable standard of care in legal malpractice actions. *In re Estate of Lee*, 954 N.E.2d at 1047. However, experts may not testify as to conclusions of law. *Hacker v. Holland*, 570 N.E.2d 951, 953 (Ind. Ct. App. 1991).

[43] In the instant matter, the Loves designated the affidavit of Harrington as expert testimony in support of their legal malpractice claim. Devereux filed a motion to strike Harrington's affidavit. He also designated the affidavit of Lee Christie on a conditional basis, arguing that Christie's affidavit should be considered as

designated evidence if the trial court did not strike Harrington's affidavit. The Loves subsequently sought to strike Christie's affidavit. The trial court denied both motions to strike, allowing both affidavits to remain part of the designated evidence.

[44] Christie's affidavit, like that tendered by Harrington, included statements relating generally to the duty an attorney owes to his or her clients and opinions relating specifically as to whether Christie believed that Devereux's actions breached that duty. Because Christie's opinions related to the factual determination of what constitutes a breach of duty we conclude that his opinions did not constitute conclusions of law. *See In re Estate of Lee*, 954 N.E.2d at 1047 (providing that "although experts may not testify as to conclusions of law, such as the existence of a duty, expert witnesses are permitted to testify to the standard of practice within a given field"). As such, we conclude that the trial court did not abuse its discretion in denying the Loves' motion to strike Christie's affidavit.

# Conclusion

[45] We conclude that the trial court erred in denying Devereux's motion for summary judgment. We also conclude that the trial court did not abuse its discretion in denying the Loves' motion to strike Christie's affidavit. Accordingly, we reverse the trial court's denial of Devereux's motion for summary judgment, affirm the trial court's denial of the Loves' motion to strike

Christie's affidavit, and remand to the trial court with instructions to enter summary judgment in favor of Devereux.

[46] The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions.

Robb, J., concurs, Riley, J., concurs in result.