

FILED

Jun 23 2017, 8:20 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jon R. Pactor
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Timothy F. Devereux
Indianapolis, Indiana

I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Rene DiBenedetto, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> Timothy Devereux, <br> *Appellee-Defendant* | June 23, 2017 <br><br> Court of Appeals Case No. <br> 49A05-1609-CT-2146 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable James A. Joven, Judge <br><br> Trial Court Cause No. <br> 49D13-1310-CT-37987 |

**Altice, Judge.**

### Case Summary

[1]     This is another legal malpractice action arising from the theft and deceit committed by former attorney William F. Conour (Conour) that led to the downfall of Conour Law Firm (the Firm) and victimized many of the Firm's

clients.[1]  Rene DiBenedetto is one such client.  In this case, DiBenedetto filed a legal malpractice complaint against Timothy Devereux, an attorney who once practiced law with the Firm.  DiBenedetto maintains that Devereux committed legal malpractice when he failed to accurately and honestly advise her regarding distribution of her settlement funds.  Devereux filed a motion for summary judgment[2] challenging the merits of DiBenedetto's legal malpractice claim.  After a hearing, the trial court granted Devereux's summary judgment motion.  DiBenedetto now appeals, arguing that genuine issues of material fact preclude entry of summary judgment in favor of Devereux.

We affirm.

## Facts & Procedural History

DiBenedetto was severely injured in a head-on collision on April 21, 2010.  On April 26, 2010, DiBenedetto entered into a contingent-fee contract with the Firm.  DiBenedetto had a personal connection to Conour and it was Conour

---

[1] For nearly thirteen years, Conour "knowingly devised and participated in a scheme to defraud and to obtain money and funds from his clients and others by means of materially false and fraudulent pretenses, representations, and promises."  *Devereux v. Love*, 30 N.E.3d 754, 757 (Ind. Ct. App. 2015) (record citation omitted), *trans. denied* (hereinafter, *Love*).  Part of Conour's scheme was that he would receive settlement funds on behalf of some clients and then unlawfully convert such settlement funds to his own use and benefit or to make settlement payments to other clients.  It was determined that Conour stole, misappropriated, and unlawfully converted to his own use more than $4,500,000 belonging to more than 25 clients.  On July 15, 2013, Conour pled guilty in federal court to one count of wire fraud.  He was subsequently sentenced to 120 months in prison and ordered to pay restitution to the client-victims.  *Id*.

[2] This is the second appeal in this case.  In the first appeal, this court addressed the limitations clause in the attorney-client contract, ultimately affirming the denial of Devereux's first motion for summary judgment. *See Devereux v. DiBenedetto*, 45 N.E.3d 842 (Ind. Ct. App. 2015).

who agreed to handle her case. Devereux was an associate attorney[3] with the Firm when DiBenedetto entered into the contract, but he was not assigned to assist with her case, nor did he perform any work related thereto.

[4]  In July 2010, DiBenedetto received a letter informing her that the Firm was being transitioned to the new law firm of Conour Devereux Hammond. This letter, which is signed by Conour, Devereux, and Jeffrey Hammond, included the following statements:

> We are pleased to introduce you to the new law firm of Conour Devereux Hammond which is taking over the cases and business of the Conour Law Firm, LLC. Of course, you already know all of us because we have been working with you on your case since its beginning.

*Appellant's Appendix, Vol. 2* at 23.[4]  In closing, the letter stated, "We look forward to continuing to work with you to the conclusion of your claim. If you have any questions or wish to discuss this matter, please call any one of us." *Id*. Despite the name change, Devereux maintains that he did not have an ownership interest in the Firm, was never a signatory on the Firm's bank accounts, and was not provided access to the Firm's financial records.

---

[3] Under the terms of his Associate Attorney Agreement, Devereux agreed to "always exercise his best professional judgment on behalf of all clients" and to "comply with all applicable laws, rules, regulations and the Rules of Professional Conduct in the performance of his duties." *Appellant's Appendix Vol. 2* at 74.

[4] These excerpts are taken from the letter that was sent to James Love. DiBenedetto maintains that she received the same letter.

[5] Ultimately, DiBenedetto's accident claims were settled without the filing of a lawsuit.[5] The first settlement for $50,000 was paid by the insurance company for the tortfeasor. DiBenedetto signed a Release in Full of All Claims and Rights on January 13, 2011, but reserved the right to maintain a claim for underinsured motorist (UIM) coverage against her own insurance company.

[6] During the summer of 2011, DiBenedetto, along with her father, stopped by the Firm unannounced to inquire about the disbursement of the January settlement. Conour was not in the office, but Devereux, being the only attorney present that day, agreed to speak with her. After consulting with the Firm's paralegal and reviewing the Firm's case-management software, Devereux met with DiBenedetto regarding the status of her case. Specifically, he acknowledged the January settlement and noted that there were medical liens[6] and a pending UIM claim. Devereux explained that "typically . . . with cases like this" the pending UIM claim "had to be settled" before the medical liens could be negotiated and that thereafter, the remaining settlement funds, if any, would be distributed to her. *Id.* at 101. He further advised DiBenedetto to follow up with Conour concerning distribution of the settlement already received.

---

[5] Pursuant to the contract with the Firm, if the matter was resolved prior to the filing of a complaint, the attorney fees were to be twenty-five percent of the gross recovery obtained.

[6] A Value Code Report dated June 15, 2011 itemizes medical expenses received by the Firm for services provided to DiBenedetto as a result of the accident. As of that date, DiBenedetto's medical expenses totaled $34,857.12.

DiBenedetto's UIM claim was settled in September 2011, and the settlement check was dated October 11, 2011. The check was endorsed by someone other than DiBenedetto[7] and deposited into the Firm's account on October 12, 2011. It was not until six weeks later, on November 29, 2011, that DiBenedetto was presented with and signed a release of all claims to finalize the settlement of the UIM claim. It is undisputed that Devereux did not participate or assist in the settlement of this claim or that he had any knowledge thereof.

In December 2011, Devereux became concerned about Conour's business practices.[8] As a result, he resigned from the Firm on December 22, 2011. DiBenedetto never received any funds from the settlement of either of her claims. It was later determined that Conour had misappropriated DiBenedetto's settlement funds received from both the tortfeasor settlement and the UIM settlement.

On December 27, 2011, Devereux contacted the Indiana Supreme Court Disciplinary Commission to express his concerns about Conour. In January 2012, the Federal Bureau of Investigation (FBI) contacted Devereux concerning an investigation regarding Conour's failure to fund trusts that he described to clients as structured annuities. Devereux was not made aware of any other

---

[7] Devereux maintains that he did not endorse the settlement check by signing DiBenedetto's name.

[8] In December 2011, Devereux became aware that Conour had not promptly remitted attorney fees to a law firm that had served as co-counsel on a case and that he had not yet forwarded settlement proceeds to a client in a wrongful death action after disbursement had been approved by the probate court. Devereux also became aware of inaccurate statements Conour made in a report to a financing company used by the Firm.

potential wrongdoing on behalf of Conour. Conour was criminally charged in federal court on April 27, 2012, and later pled guilty to one count of wire fraud.

[10] On October 11, 2013, DiBenedetto filed a complaint against Devereux for legal malpractice, alleging that Devereux was negligent, breached his fiduciary duties, and breached his contractual obligations by not providing her with accurate information when she inquired about disbursement of her settlement funds during the summer of 2011. On March 23, 2016, Devereux filed the instant motion for summary judgment, arguing that, as a matter of law he did not breach any duty he owed to DiBenedetto. The trial court held a hearing on July 11, 2016. On September 2, 2016, the trial court entered an order granting summary judgment in favor of Devereux. The trial court made no findings of fact and did not set forth the basis for its decision. DiBenedetto now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[11] DiBenedetto argues that the trial court erred in granting summary judgment in favor of Devereux. We review an order granting summary judgment de novo. *Adams v. ArvinMeritor, Inc.*, 48 N.E.3d 1, 9 (Ind. Ct. App. 2015). Summary judgment is appropriate if, after reviewing the designated evidence, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the

undisputed material facts support conflicting reasonable inferences. *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009). When the trial court has granted summary judgment, the nonmoving party has the burden on appeal of persuading us that the grant of summary judgment was in error. *Adams*, 48 N.E.3d at 9.

[12]    "Under Indiana Law, the elements of legal malpractice are: (1) employment of an attorney, which creates a duty to the client; (2) failure of the attorney to exercise ordinary skill and knowledge (breach of the duty); and (3) that such negligence was the proximate cause of (4) damage to the plaintiff." *Van Kirk v. Miller*, 869 N.E.2d 534, 541 (Ind. Ct. App. 2007) (quoting *Clary v. Lite Machines Corp.*, 850 N.E.2d 423, 430 (Ind. Ct. App. 2006)), *trans. denied*. "A defendant is entitled to judgment as a matter of law when the undisputed material facts negate at least one element of the plaintiff's claim." *Clary*, 850 N.E.2d at 430.

[13]    "Adequate communication and integrity when dealing with clients is a vital component of any attorney-client relationship." *Matter of Levy*, 726 N.E.2d 1257, 1259 (Ind. 2000). It therefore goes without saying that Devereux owed DiBenedetto a duty to provide her with truthful, accurate, and non-misleading information when he met with her during the summer of 2011. *See* Ind. Professional Conduct Rule 1.4(a)(2) (requiring attorneys to "reasonably consult with the client about the means by which the client's objectives are to be accomplished"); Prof. Cond. R. 1.4(b) (noting that attorneys are to "explain a matter to the extent reasonably necessary to permit the client to make informed

decisions regarding the representation"). We conclude as a matter of law, however, that given the circumstances, Devereux did not breach this duty.

[14] Whether a particular act or omission amounts to a breach of an attorney's duty is generally a question of fact for the jury. *Oxley v. Lenn*, 819 N.E.2d 851, 856 (Ind. Ct. App. 2004). However, breach can become a question of law where the facts are undisputed and only a single inference can be drawn therefrom. *Id*.

[15] DiBenedetto argues that Devereux breached his duty to provide her with truthful and accurate information. She asserts:

> [Devereux] never corrected or supplemented the advice that he gave. For example, he knew that Conour had not "promptly" distributed any of the money from the first settlement and had not "promptly" notified any health care provider or subrogee of the settlement. He knew or should have known that there was no legal obligation for her to wait for the completion of the underinsurance claim before money could be distributed. He knew that nothing had been distributed from either settlement when he left the firm in December 2011. Even at that time, he said nothing to her about problems with the handling of her money.

*Appellant's Brief* at 23-24. DiBenedetto designated an affidavit of an attorney, who opined that Devereux "inaccurately represented that there was no reason for concern" when DiBenedetto inquired as to why her settlement had not been distributed six months after she settled the claim with the tortfeasor's insurance company. *Appellant's Appendix, Vol. 3* at 123. In the attorney's opinion, Devereux should have taken some actions to protect DiBenedetto by

investigating further and advising her that she may not want to wait for distribution of the settlement that had already been received.

[16] Devereux argues that he provided DiBenedetto with accurate information and further advised DiBenedetto to consult with Conour directly regarding the disbursement of her settlement. He also asserts that the crux of DiBenedetto's claim is that he "knew or should have known that CONOUR was mishandling [her] settlement proceeds" and should have so informed her when he met with her during the summer of 2011. *Appellee's Appendix* at 21. Devereux directs us to *Love* and argues that the same result obtains.

[17] The underlying claim in *Love* arose out of the same type of deceit and wrongdoing by Conour that precipitated the instant action. In August 2008, shortly after Devereux joined the Firm, the Loves hired the Firm to represent them in a personal-injury action. Devereux was subsequently assigned, by Conour, to work on the Loves' case and he was also identified as an attorney of record to the court. When Devereux terminated his employment with the Firm in December 2011, he informed the Loves generally of his departure and the Loves signed a form indicating their desire that Conour and the Firm continue to represent them.

[18] After the Loves discovered Conour's misconduct, they filed a complaint against Devereux for legal malpractice, alleging that he failed to warn them of Conour's potential wrongdoing. The trial court denied Devereux's motion for summary judgment and Devereux appealed. In considering whether Devereux breached

his duty to exercise ordinary skill and knowledge in relation to his representation of the Loves, this court was careful not to consider the matter "through the lens of hindsight," but rather focused on what Devereux knew at the time he was alleged to have committed malpractice by failing to warn the Loves of Conour's potential wrongdoing. *Love*, 30 N.E.3d at 764.

[19] The designated evidence revealed to the court that while Devereux had concerns about Conour's actions relating to operation of the Firm, such suspicions related only to poor business practices. The court further noted that the designated evidence also supported Devereux's assertion that he did not have any specific knowledge of wrongdoing by Conour relating to the Loves, the mishandling of any active cases, or any wrongdoing other than delaying payments. This court concluded:

> [t]he designated evidence outlining Devereux's knowledge at the time he terminated his employment from the Firm is insufficient to create an issue of material fact with regards to whether Devereux knew, or even should have known, that Conour would breach the trust instilled in him by his clients by stealing client funds.

*Love*, 30 N.E.3d at 765. Thus, this court held that Devereux's decision to not discuss his concerns with the Loves did not amount to a breach of duty to warn the Loves of Conour's potential wrongdoing. This court therefore reversed the trial court's determination and remanded with instructions that the trial court enter summary judgment in favor of Devereux.

[20] Like the Loves, DiBenedetto was also victimized by Conour and is seeking redress from Devereux. Devereux asserts that despite the factual differences between the Loves' scenario and the instant action, this court's analysis in *Love* as to whether he breached a duty owed to DiBenedetto is applicable. He maintains that his designated evidence, which is virtually identical to the evidence relating to his knowledge that was designated in *Love*, shows that he was not aware of Conour's wrongdoing at the time he consulted with DiBenedetto about the distribution of her settlement proceeds. Devereux further emphasizes that he was never assigned to work on DiBenedetto's case, that he did not perform any work on DiBenedetto's case, and that he spoke with her on only one occasion when he explained to her the status of her case as outlined in the Firm's case management system. Based on these facts, Devereux asserts that he did not breach any duty owed to DiBenedetto and thus, the trial court properly granted summary judgment in his favor.

[21] DiBenedetto points to factual differences in arguing that *Love* is inapposite to this case. Specifically, DiBenedetto notes that Conour settled the Loves' claim without their permission and stole their money months after Devereux left the firm while both of her claims were settled with her knowledge and prior to Devereux's departure. DiBenedetto asserts that "the most critical distinction" is that, unlike the Loves, she "sought information directly from [Devereux] about why her settlement in January 2011 had not been distributed." *Appellant's Brief* at 18.

[22]     Our analysis focuses on the meeting between DiBenedetto and Devereux during the summer of 2011. DiBenedetto stopped by the Firm unannounced. It just so happened that Conour was not in the office that day, but Devereux was. Even though Devereux knew nothing about DiBenedetto's case, he took a few minutes to confer with the Firm's paralegal and review the Firm's case management summary with respect to her case. Devereux then met with DiBenedetto and informed her about the status of her case—confirming the settlement of the tortfeasor claim and also noting that there were several outstanding medical bills/liens and a pending UIM claim. There is no dispute that the information Devereux provided was accurate.

[23]     To the extent Devereux advised that the UIM claim "had to be settled" before the money would be distributed, we conclude that such does not support a determination that Devereux breached his duty to provide DiBenedetto with accurate information or breached his duty to exercise ordinary skill and knowledge. *Appellant's Appendix Vol. 2* at 101. Devereux acknowledges that he told DiBenedetto that "typically" in cases such as hers, all claims "had to be settled" before the medical liens would be negotiated and that only thereafter would the remaining settlement funds, if any, be disbursed to her. In support of his position, Devereux designated evidence in the form of an attorney affidavit that "[i]t is common practice that medical bills or liens are frequently not resolved with the payment of limits by the underlying tortfeasor's carrier, particularly if the bills or liens are a significant portion of the underlying tortfeasor's settlement." *Appellant's Appendix Vol. 3* at 99. Given that at the time

Devereux had no reason to suspect any wrongdoing by Conour with regard to DiBenedetto's settlement funds, his advice in this regard was not inaccurate or necessarily misleading.

[24] DiBenedetto's designated evidence does not contradict Devereux's designated evidence to the effect that it is common practice to wait until all claims are settled before a settlement is disbursed. DiBenedetto's expert simply opines that Devereux "knew or should have known," *Id.* at 121, that something was amiss because Conour had not "promptly" disbursed the settlement funds to cover medical liens and paid the balance to DiBenedetto pursuant to Prof. Cond. R. 1.15(d).[9] DiBenedetto's expert opines that Devereux breached his duty by failing to advise DiBenedetto that there was sufficient money to pay her health care providers and resolve any liens and as a result, the money in the trust account "should have delivered promptly." *Appellant's Appendix Vol. 2* at 121. In reaching this opinion, however, the expert had to make certain assumptions, such as, that the Firm's records were complete, that all medical bills had been received, and/or that the UIM claim would be settled prior to the filing of a complaint. Devereux's duty was to provide DiBenedetto with accurate

---

[9] Prof. Cond. R. 1.15(d) provides:

> Upon receiving funds or other property in which the client or third person has an interest, a lawyer shall *promptly* notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall *promptly* deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall *promptly* render a full accounting regarding such property.

(Emphasis supplied).

information and he did just that. To the extent the information Devereux provided DiBenedetto did not satisfactorily answer her question regarding the distribution of the first settlement proceeds, Devereux advised her to speak directly with Conour, who had been responsible for the case since the beginning.

[25] DiBenedetto's argument that Devereux knew or should have known that something was amiss when he reviewed her case file is based on a view of the facts as they existed at the time of her meeting with Devereux through the lens of hindsight. Now armed with the knowledge that Conour misappropriated her settlements, she seeks to reach back in time and blame Devereux for not knowing that her settlement funds had not been properly safeguarded. At that time, Devereux had gathered basic information about DiBenedetto's case as reflected in the Firm's records and provided that information to her.

[26] With regard to Devereux's explanation to DiBenedetto that she would have to wait until her UIM claim was settled, such was consistent with what Devereux considered common practice and as such, the fact that the settlement had yet to be distributed did not raise any red flags. We further note that to the extent there were questions beyond the overview of information about DiBenedetto's case contained in the Firm's records, Devereux advised DiBenedetto to speak directly with Conour as he was the only one who had worked on her case and knew the details thereof. Under the facts of this case, we conclude as a matter of law that Devereux did not breach his duty to exercise ordinary skill and knowledge or to provide DiBenedetto with accurate and non-misleading

information. Having concluded that the designated evidence establishes that Devereux did not breach any duty owed to DiBenedetto, we affirm the trial court's grant of summary judgment in favor Devereux.

## Attorney Fees

[27] Devereux requests an award of attorney fees and other sanctions pursuant to Ind. Appellate Rule 66, which provides:

> G. **Damages for Frivolous or Bad Faith Filings.** The Court may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees. The Court shall remand the case for execution.

[28] Devereux asserts that the dispositive issue – his knowledge of Conour's wrongdoing – was previously decided by this court in *Love* and notes that no new evidence was presented in this case that would have any effect on that holding. Devereux further asserts that DiBenedetto even resorted to scandalous accusations by alleging in her complaint that he "effectively and knowingly assisted . . . Conour to violate the Rules of Professional Conduct." *Appellant's Appendix, Vol. II* at 17. Devereux maintains that attorney fees are warranted given that DiBenedetto persisted in asserting a baseless position, forcing him to once again defend himself against an issue already decided in *Love*.

[29] As the above discussion illustrates, the *Love* decision was not entirely dispositive of the issue in this case in light of the different factual circumstances. We therefore do not find that the appeal was frivolous or brought in bad faith.

Moreover, we conclude that the challenged averment is not so scandalous that it supports an award of attorney fees. Devereux's request is denied.

[30]   Judgment affirmed.

[31]   Riley, J., concurs.

[32]   Crone, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Rene DiBenedetto,

*Appellant-Plaintiff,*

v.

Timothy Devereux,

*Appellee-Defendant*

Court of Appeals Case No.
49A05-1609-CT-2146

**Crone, Judge, dissenting.**

[33] I respectfully dissent from the majority's affirmance of summary judgment in Devereux's favor. The majority assumes, without deciding, that an attorney-client relationship existed between Devereux and DiBenedetto, who had dealt solely with Conour until the summer of 2011. I agree with this assumption, but it is important to note that "[c]reation of an attorney-client relationship is not dependent upon the formal signing of an employment agreement or upon the payment of attorney fees. An attorney-client relationship need not be express, but may be implied by the conduct of the parties." *Matter of Anonymous*, 655 N.E.2d 67, 70 (Ind. 1995). "Attorney-client relationships have been implied where a person seeks advice or assistance from an attorney, where the advice sought pertains to matters within the attorney's professional competence, and where the attorney gives the desired advice or assistance." *Id.*

[34] The designated evidence most favorable to DiBenedetto as the nonmoving party establishes that in July 2010, Devereux, Conour, and Hammond signed a letter to DiBenedetto on the Firm's letterhead that stated, "[W]e are continuing to represent you as your attorneys[,]" and, "We look forward to continuing to work with you to the conclusion of your claim. If you have any questions or wish to discuss this matter, please call any one of us." Appellant's App. Vol. 2 at 65. According to DiBenedetto's affidavit, sometime after she received that letter, Conour told her "that *all* of the attorneys would be working on [her] case." Appellant's App. Vol. 3 at 29 (emphasis added). When DiBenedetto visited the Firm in the summer of 2011 to ask about "the settlement of [her] case" and "when [she] would be receiving payments[,]" Devereux "did not tell [her] that he was only an employee or that [she] could not rely on him." *Id*. at 30, 29. In response to DiBenedetto's inquiry, Devereux told her that she "would not be receiving money until the liens had been taken care of." *Id*. at 30. At the very least, this evidence is sufficient to create a genuine issue of material fact as to whether an attorney-client relationship existed between Devereux and DiBenedetto.

[35] As DiBenedetto's attorney, Devereux owed her a general duty to exercise ordinary skill and knowledge. *In re Estate of Lee*, 954 N.E.2d 1042, 1047 (Ind. Ct. App. 2011), *trans. denied* (2012). And, as the majority acknowledges, it "goes without saying" that he owed her "a duty to provide her with truthful, accurate, and non-misleading information when he met with her during the summer of 2011." Slip op. at 7 (citing Ind. Professional Conduct Rules

1.4(a)(2) and 1.4(b)). The majority concludes as a matter of law that Devereux did not breach this duty. I respectfully disagree.

[36] In support of her response to Devereux's summary judgment motion, DiBenedetto submitted the affidavit of an experienced practicing attorney who opined that Devereux breached the applicable standard of care, based in part on his belief that Devereux knew or should have known that Conour had not complied with Professional Conduct Rule 1.15(d) and that Devereux should have advised DiBenedetto accordingly. Rule 1.15(d) states,

> Upon receiving funds or other property in which the client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall *promptly* deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(Emphasis added.)

[37] During his meeting with DiBenedetto, Devereux became aware that the $50,000 settlement check from the tortfeasor had been deposited in Conour's trust account at least five months earlier and that DiBenedetto's bills for medical services (the last of which had been rendered at least six months earlier) totaled less than $35,000. Thus, Devereux also became aware that Conour had not promptly delivered to DiBenedetto any funds that she was entitled to receive. *See Matter of Helmer*, 634 N.E.2d 56, 56 (Ind. 1994) (finding that

attorney violated Ind. Professional Conduct Rule 1.15 by waiting *three* months to deliver client's portion of settlement funds). In his deposition, Devereux testified that he told DiBenedetto and her father that "they would have to ask Mr. Conour" about "when they would be getting payments" and "explained typically what happened with cases like this if there were medical liens, both cases had to be settled, the underlying lawsuit and the UIM claim, and then the medical bill liens had to be resolved" and that "generally, that's how the system works." Appellant's App. Vol. 2 at 101. Another experienced practicing attorney who submitted an affidavit in support of Devereux's summary judgment motion took a similar position. Appellant's App. Vol. 3 at 99. Simply because attorneys "generally" handle certain cases in a certain way does not mean that the procedure always complies with the Professional Conduct Rules adopted by our state's highest court.

[38] At oral argument, Devereux conceded that a minimum of $10,000 of the $50,000 settlement was unencumbered by any potential medical liens or attorney fees, that there was no legal impediment to distributing that amount to DiBenedetto at that time, and that he did not advise her that she had a present right to receive those funds. *See* Oral Arg. at 22:29-24:21.[10] Had he done so, DiBenedetto could have asked for and received the funds from Conour, or she might have been put on notice that something sinister was afoot and terminated

---

[10] Devereux also conceded that any subsequent reduction of the medical bills via negotiations with health care providers could only have resulted in a larger recovery for DiBenedetto. *See* Oral Arg. at 23:03-23:15.

her relationship with Conour. It is important to remember that her funds were still in Conour's trust account at that time.

[39] Personal injury plaintiffs are often strapped for cash and hounded by creditors while they wait for their cases to be resolved. They are also often unfamiliar with the ins and outs of negotiations and settlements and the professional responsibilities of the attorneys who are legally and ethically obligated to protect their interests. Consequently, it is imperative for attorneys to comply with Professional Conduct Rule 1.15(d) and either promptly distribute funds to which their clients are indisputably entitled or, at a minimum, advise them of their right to receive those funds. Based on the evidence most favorable to DiBenedetto as the nonmoving party, I believe that genuine issues of material fact exist regarding whether Devereux breached his duty to provide DiBenedetto with truthful, accurate, and non-misleading information regarding Conour's handling of the tortfeasor's settlement funds and her present right to receive those funds, as well as whether any breach proximately caused her alleged damages relating to those funds.[11] Therefore, I would reverse the trial court's grant of summary judgment in Devereux's favor, remand for trial, and deny Devereux's request for attorney fees.

---

[11] Because there is no evidence that Devereux had any further involvement with DiBenedetto or had any knowledge of Conour's subsequent settlement of her UIM claim, I do not believe that he may be considered a proximate cause of her failure to receive those funds.