FILED

Oct 29 2019, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

Arthur R. Baxter, Jr.
Cynthia S. Rose
Baxter Rose & Schrager LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Michele S. Bryant
Lauren E. Dimmitt
Wooden McLaughlin LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nataomi Riley and Frank Riley,<br>*Appellants-Plaintiffs,*<br><br>v.<br><br>St. Mary's Medical Center of<br>Evansville, Inc.,<br>*Appellee-Defendant* | October 29, 2019<br><br>Court of Appeals Case No.<br>19A-CT-844<br><br>Appeal from the Vanderburgh<br>Circuit Court<br><br>The Honorable David D. Kiely,<br>Judge<br><br>Trial Court Cause No.<br>82C01-1809-CT-4911 |

**Crone, Judge.**

## Case Summary

[1] Nataomi Riley and her husband, Frank Riley, filed a medical malpractice complaint against St. Mary's Medical Center of Evansville, Inc. ("the Hospital"), alleging that a Hospital radiologic technologist ("RT") was negligent in injecting contrast dye into Nataomi's arm in preparation for a CT

scan and that the negligence proximately caused various injuries. The Hospital moved for summary judgment. In response, the Rileys designated an affidavit from another RT who opined that the Hospital's RT breached the applicable standard of care and that this negligence proximately caused Nataomi's injuries. The Hospital conceded that the RT's affidavit established a genuine issue of material fact regarding a breach of the standard of care, but argued that the RT was not qualified to render an expert opinion on proximate causation. The trial court granted the Hospital's summary judgment motion. On appeal, the Rileys argue that their RT is qualified to render an expert opinion on proximate causation and that a genuine issue of material fact exists regarding that issue. We agree and therefore reverse and remand for further proceedings.

## Facts and Procedural History

[2] The designated evidence most favorable to the Rileys as the summary judgment opponents indicates that at approximately 3:00 p.m. on June 8, 2015, sixty-eight-year-old Nataomi arrived at the Hospital for a CT scan with contrast dye to rule out a pulmonary embolism. According to Nataomi's affidavit, she had had "the same test done before and never had any problems." Appellants' App. Vol. 2 at 50. When Hospital employee RT Karen Osborne "came into the room to insert the dye [Nataomi] told her that [she had] always been a 'hard stick', and [Osborne's] reply was 'Don't worry this is not my first rodeo. I've been doing this for over 25 years.'" *Id*. Osborne inserted an IV into Nataomi's right forearm, went behind a barrier to avoid radiation exposure from the CT scan, and used a remote control to inject a thirty-milliliter pressurized "smart

prep" test dose of dye into Nataomi's arm at four milliliters per second. *Id*. at 152. "As the dye was going into [Nataomi's] arm it was so painful [she] kept telling [Osborne], 'it hurts, it hurts'." *Id*. at 50. "With the intense pain [Nataomi] was having [she] just knew it was going into the tissue and [she] told [Osborne] that." *Id*. Once the entire test dose was injected, Osborne put Nataomi "into the [x]-ray machine. After a few seconds [Nataomi] was screaming to get [her] out of the machine because the pain went from [her] whole arm up to [her] shoulder." *Id*. When Osborne came to get Nataomi out of the machine, Osborne said, "'I knew there was a problem when looking at your x-ray.'" *Id*. According to Osborne's affidavit, she "fail[ed] to visualize the contrast in [Nataomi's] chest [on the machine's monitor] within 5 to 6 seconds of the injection[.]" *Id*. at 54.

[3] "Another technician then inserted a needle in [Nataomi's] left arm and there was no pain when the dye went in [her] left arm." *Id*. at 50. Nataomi received a thirty-milliliter test dose and an additional seventy milliliters of dye in her left arm, for a total of 100 milliliters. *Id*. at 167-69. "The technicians put [her] back in the x-ray machine and it seemed like just a few minutes went by and [her] x-ray was finished." *Id*. at 50. Osborne "observed swelling that resembled a small egg [on Nataomi's right arm] and [Nataomi] complained of some pain." *Id*. at 54. Osborne "concluded an infiltration had occurred" and "applied

compresses, massaged the area, and elevated [Nataomi's] right arm." *Id.*[1] According to Nataomi, Osborne "wrapped a dressing around [her] right arm and said, you might have a little bruising and swelling within an hour or after coming home and she left the room." *Id.* at 50. Osborne did not notify the Hospital's radiologist, Dr. Tony Findley, about the infiltration.

[4]  Nataomi got home between 6:30 and 7:30 p.m., and "[s]oon after" her "arm continued to swell so bad that the flesh broke open on [her] right hand and fluid was running out." *Id.* She called the "x-ray department and spoke to a technician and explained what was going on." *Id.* The technician told Nataomi "to apply alternating cold and hot compresses on [her] arm" and "that if it got too bad to go to the emergency room." *Id.* at 50-51. Around 10:00 p.m., "the pain became so unbearable and the swelling so bad that [Frank] took [Nataomi] to the Emergency Room. The ER doctor gave [her] morphine for the pain and ordered an [x]-ray for [her] right arm." *Id.* at 51. "When they moved [her] arm it was so painful that [she] was screaming and thought [she] would pass out from the pain." *Id.* "A short time later a trauma surgeon [Dr. Todd Burry] came in and commented that he had hardly ever seen a case like

---

[1] An infiltration is "something that passes or is caused to pass into or through something by permeating or filtering *especially*: a substance that passes into the bodily tissues and forms an abnormal accumulation." MERRIAM-WEBSTER ONLINE DICTIONARY, https://merriam-webster.com/dictionary/infiltration (last visited Oct. 8, 2019).

this and he was going to have to do surgery." *Id.* Nataomi was diagnosed with "[r]ight arm IV contrast extravasation." *Id.* at 72.[2]

[5]     Nataomi went into surgery at about 5:30 a.m. Dr. Burry's notes indicate that Nataomi was administered general anesthesia and preoperative antibiotics. "The hematoma/fluid collection was then identified. A linear incision was made approximately 2 inches in length parallel with the radius.… Immediately the hematoma was entered and fluid was drained. Hematoma was debrided and this hematoma was approximately 5 inches in length overall." *Id.* A "wound VAC [vacuum-assisted closure] was cut to the appropriate size … and then covered with appropriate dressing." *Id.* Nataomi was discharged "on June 12, 2015 and then had weeks of home health care with the wound [VAC]." *Id.* at 51.

[6]     According to Nataomi, who is right-handed, "[t]he skin is tight over the healed wound and pulls. The surgeon said that there is nothing he can do for that." *Id.* "Ever since the surgery, on average of two to three times a day, [she gets] a sharp electrical shock running from [her] wrist down into [her] fingers." *Id.* "The surgeon told [her] that [she has] nerve damage. [Her] grip is not as secure. [She] will be holding something in the right hand and all of a sudden it

[2] Extravasation is the "infiltration or effusion from a proper vessel or channel (such as a blood vessel) into surrounding tissue." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/extravasation (last visited Oct. 8, 2019).

will just drop out of [her] hand." *Id*. "While writing [her] fingers will start to curl and [she has] to stop and take [her] left hand and uncurl them." *Id*.

[7] In January 2016, the Rileys filed a proposed medical malpractice complaint against the Hospital with the Indiana Department of Insurance, alleging that as a result of medical negligence Nataomi "developed compartment syndrome of the right arm requiring emergency surgery and prolonged wound care" and "suffered permanent neurological and muscular damage to [her] right arm[,]" among other injuries, and that Frank suffered a loss of consortium. *Id*. at 22. In June 2018, the medical review panel unanimously opined that the evidence submitted by the parties did not support the conclusion that the Hospital "failed to comply with the appropriate standard of care" and that the Hospital's conduct "was not a factor in the injuries and damages of which [the Rileys] complained." *Id*. at 28, 31, 34.

[8] In September 2018, the Rileys filed a medical malpractice complaint against the Hospital in the trial court. The Hospital filed a motion for summary judgment and designated the medical review panel's opinion. In response, the Rileys designated Nataomi's medical records, Osborne's deposition, Dr. Findley's answers to interrogatories,[3] and affidavits from Nataomi, Osborne, and RT Barry Southers, who opined that Osborne "did not follow the standard of care in these circumstances and that conduct was a factor in the resultant injury to

---

[3] Dr. Findley was named as a defendant in the Rileys' complaint but was ultimately dismissed.

[Nataomi]." *Id*. at 57. In its reply to the Rileys' response, the Hospital argued that Southers was "not qualified to render an expert opinion as to medical causation" and cited cases to support its argument. Appellants' App. Vol. 3 at 9.[4] At the summary judgment hearing, the Hospital conceded that Southers's affidavit established a genuine issue of material fact regarding a breach of the standard of care, but reiterated its argument that Southers was not qualified to render an expert opinion on causation. In March 2019, the trial court issued an order summarily granting the Hospital's summary judgment motion. The Rileys now appeal. Additional facts will be provided below.

## Discussion and Decision

[9] The Rileys argue that the trial court erred in granting the Hospital's summary judgment motion. "We review a summary judgment ruling by applying the same standard as the trial court: if the evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Lorenz v. Anonymous Physician #1*, 51 N.E.3d 391, 397 (Ind. Ct. App. 2016). Just as the trial court does, we resolve all questions and view all evidence in the light most favorable to the non-moving party, so as to not improperly deny that party its day in court. *Sorrells v. Reid-Renner*, 49 N.E.3d 647, 650 (Ind. Ct. App. 2016) (quoting

---

[4] Citing *A House Mechanics, Inc. v. Massey*, 124 N.E.3d 1257 (Ind. Ct. App. 2019), the Rileys assert that the Hospital's objection to Southers's qualifications was insufficient to preserve the causation issue for appeal. We disagree.

*Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1259 (Ind. 2014)). "Evidence sufficient to support a verdict is not required" to establish a genuine issue of material fact. *Siner v. Kindred Hosp. L.P.*, 51 N.E.3d 1184, 1189 (Ind. 2016).

[10] "Indiana's distinctive summary judgment standard imposes a heavy factual burden on the movant to demonstrate the absence of any genuine issue of material fact on at least one element of the claim." *Id*. at 1187. For a medical malpractice claim, those elements are (1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; and (3) that the breach proximately caused the plaintiff's injuries. *Id*. "A 'unanimous opinion of the medical review panel' in favor of the movant is 'ordinarily sufficient' to meet [the movant's] initial burden, requiring the non-movant to rebut the medical panel opinion with expert medical testimony." *Id*. (quoting *Stafford v. Szymanowski*, 31 N.E.3d 959, 961 (Ind. 2015)). "[E]xpert opinions which conflict on ultimate issues necessarily defeat summary judgment." *Id*. at 1190.

[11] In this case, it is undisputed that the Hospital (through Osborne, its employee) owed Nataomi a duty, and that a genuine issue of material fact exists regarding whether the Hospital breached that duty. The question remains whether Southers's affidavit is sufficient to rebut the medical review panel's opinion on the element of causation, i.e., whether Southers is sufficiently qualified to render an expert opinion on whether the Hospital's breach proximately caused Nataomi's injuries. "Proximate cause requires that there be a reasonable connection between the defendant's allegedly negligent conduct and the

plaintiff's damages. Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct." *Clary v. Lite Mach. Corp.*, 850 N.E.2d 423, 430 (Ind. Ct. App. 2006) (quoting *Gates v. Riley ex rel. Riley*, 723 N.E.2d 946, 950 (Ind. Ct. App. 2000), *trans. denied*).

[12] Expert testimony is governed by Indiana Evidence Rule 702, which provides,

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

"Two requirements must be met for a witness to qualify as an expert." *Totton v. Bukofchan*, 80 N.E.3d 891, 894 (Ind. Ct. App. 2017). "First, the subject matter must be distinctly related to some scientific field, business, or profession beyond the knowledge of the average layperson; and second, the witness must be shown to have sufficient skill, knowledge, or experience in that area so that the opinion will aid the trier of fact." *Id.*

[13] "The general rule is that non-physician healthcare providers [like Southers] are not qualified under Evidence Rule 702 to render opinions as to medical causation." *Id.* (citing, inter alia, *Nasser v. St. Vincent Hosp. & Health Servs.*, 926 N.E.2d 43 (Ind. Ct. App. 2010), *trans. denied*, and *Long v. Methodist Hosp. of Ind., Inc.*, 699 N.E.2d 1164 (Ind. Ct. App. 1998), *trans. denied* (1999)). "The rationale

for this general rule is that there is a significant difference in the education, training, and authority to diagnose and treat diseases between physicians and non-physician healthcare providers." *Id.* "However, there is not a blanket rule that prohibits non-physician healthcare providers from qualifying as expert witnesses as to medical causation under Evidence Rule 702." *Id.* This Court has held "that a non-physician healthcare provider may qualify under Evidence Rule 702 to render an opinion as to medical causation if the causation issue is not complex." *Id.* (citing *Curts v. Miller's Health Sys.*, 972 N.E.2d 966 (Ind. Ct. App. 2012)). "The determinative question is whether [the non-physician healthcare provider] has sufficient expertise, as provided in Rule 702(a), with the factual circumstances giving rise to the claim and the patient's injuries." *Id.* (quoting *Curts*, 972 N.E.2d at 971) (alteration in *Totton*).

[14]    Southers's affidavit reads in relevant part as follows:

> 1. My name is Barry Southers and I am at least 18 years of age. I have first hand knowledge of the facts to which I testify below.
>
> 2. My profession is Radiologic Technologist and my CV is attached to this affidavit.[5] My current job title is Associate Clinical Professor/Senior Clinical Research Associate, Magnetic Resonance Imaging (MRI) Program Director, College of Allied Health Sciences, University of Cincinnati, Ohio.

---

[5] Southers's CV states that he has earned an associate's degree in applied science in radiologic technology, a bachelor's degree in radiation science technology, and a master's degree in medical education. Appellants' App. Vol. 2 at 240. Southers received certification in radiologic technology and in magnetic resonance imaging through the American Registry of Radiologic Technologists. *Id.* He has over twenty-five years of "clinical experience in the healthcare industry, including several years of experience in medical research, medical education, and clinical medical imaging[.]" *Id.* at 241.

3. I have performed many medical imaging scans and administered contrast media to patients.

4. I know the applicable standard of care for a radiologic technologist in the circumstances of this case.

5. I have reviewed the following documents regarding this case: the Submission of [the Hospital] to the Medical Review Panel, the affidavit of Karen Osborne, RT, the affidavit of the patient Ms. Riley, Dr. Findley's Answers to Interrogatories, the relevant medical records including the Adverse Event Report and other policies and procedures of [the Hospital] relevant to this event, the Plaintiff's Submission to the Medical Review Panel, [the Hospital's] answers to requests for admissions, the deposition of Karen Osborne, RT with the attached exhibits.

6. Based on my education, training, and skills, it is my opinion that it is apparent that a breach of [the Hospital's] contrast media administration protocol occurred on the day of June 8, 2015 regarding Ms. Riley. The Radiologic Technologist, Ms. Osborne, did not follow the standard of care in these circumstances and that conduct was a factor in the resultant injury to Ms. Riley.

7. [The Hospital's] Radiology Department has a policy regarding contrast media administration titled "*Administration of Intravenous Contrast Material Policy Statement*". This policy was current at the time this event occurred and was applicable to this case.

8. According to the documentation provide and Ms. Osborne's deposition testimony, this Policy statement applied to Ms. Osborne.

9. In the policy section E, titled *Special Notes*, it states:

> "*In the event of an allergic reaction to contrast media, an infiltrated IV, or if the patient develops a hematoma or complains of pain at injection site, the radiologist or supervising physician is to be notified and will monitor the patient.*"
>
> "*In the event of any of the above mentioned occurring, an incident report will be filled out*".

10. Ms. Osborne has little recollection of notifying the radiologist who was available at that time. There is no contemporaneous documentation to indicate whether Ms. Osborne, did, or did not, notify the doctor of the infiltration of the contrast media as required by the Policy.

11. The radiologist who was available at the time of this event states in his Answers to Interrogatories that he was not notified of this infiltration, that he did not see Ms. Riley that day, that the medical records support his recollection that he was not notified that this IV infiltrated with the administration of contrast media nor did he see Ms. Riley at all that day.

….

14. In addition, it is my opinion that when a Radiologic Technologist begins an infusion of contrast media such as Omnipaque used in this case, and the patient complains of pain/burning at the sight [sic] of the infusion, the RT should stop the procedure and check the IV for patency again before additional contrast is infused. It is important to note that it is not uncommon for patients to describe a burning sensation when contrast media is intravenously delivered not necessarily indicating contrast media extravasation, injection time is typically very short for Smart Prep (approximately seven seconds in this case), and RTs are not physically present in the scan room at the time of injection to prevent radiation exposure from the CT scan. As stated in her statement, the Plaintiff stated that when "the dye was going into my arm it was so painful I kept telling

her it hurts", and given the previous testimony from both Ms. Osborne and the Plaintiff regarding being a "hard stick", having "bad veins", and lowering the pressure of contrast media administration, a reasonable and careful action following contrast media administration would be to immediately stop the injection after noticing there was no visualization of contrast media on the CT images. This action was described by Ms. Osborne in her deposition statement, however no specifics as to how long this action took are noted, nor any mention of how much contrast media was administered prior to Ms. Osborne stopping the injection.[6] By the time Ms. Osborne observed the IV site, she described it as being egg-size swollen. That observation in addition to the patient's complaints suggest further examination by the RT to determine if the IV was infiltrated prior to further administration of contrast.

15. All of the conduct described above was a factor in the injury that Ms. Riley suffered in her hand/arm and resulted in her return to the Emergency Room the evening of June 8, 2015 at approximately 2255 (10:55 PM). Ms. Riley's CT scan was at approximately 3:00 p.m. on June 8, 2015, and Ms. Riley recalls arriving at her home between 6:30 and 7:30 pm.

16. When Ms. Riley arrived at the ER, she told the ER personnel that she had a CT scan that afternoon. "Pt. reports that there was a problem with the contrast and her arm began hurting when they "put the dye in" …. Pt. right forearm discolored on posterior portion of arm. Swelling present. Swelling and discoloration extends from finger tips to approximately 8 cm distal of elbow".

17. Ms. Riley was admitted to the hospital from the ER and had

---

[6] Actually, Osborne stated in her affidavit that she "injected a smart prep test bolus of 20 to 30 milliliters of contrast." Appellants' App. Vol. 2 at 54. And in her deposition, Osborne stated that she injected thirty milliliters of contrast. *See id*. at 161-62 ("Well, the injection itself -- the machine stopped it at 30, and then there's a pause before we would do the next injection.").

surgery performed by Dr. Burry to remove the contrast from the tissue and clean the wound. She also required a wound vac and antibiotics to treat the wound.

Appellant's App. Vol. 2 at 56-59 (citation omitted).

[15] In sum, Southers opined that Osborne should have stopped injecting the contrast dye into Nataomi's arm as soon as Nataomi complained of pain and notified Dr. Findley about the infiltration, and that Osborne's failure to do so was a factor in causing the injuries suffered by Nataomi. The Hospital argues,

> Because some contrast medium is introduced into the surrounding tissue in the absence of negligence, expert medical evidence must be provided to demonstrate that [Nataomi's] injuries were either caused entirely by the introduction of additional contrast medium *after* breaching the standard of care or that her injuries were exacerbated by the introduction of that additional contrast medium. This is a complicated medical question that is beyond the scope of a layperson's understanding and requires qualified expert medical testimony.

Appellee's Br. at 12.

[16] We disagree. The Hospital cites no authority for its assertion that some contrast medium may be introduced into the surrounding tissue in the absence of negligence; in any event, as the Rileys observe, "[s]ome contrast going in the tissue is different from a *significant* amount of contrast going into the tissue." Reply Br. at 9. Even Osborne herself acknowledged that "the more contrast that infiltrates under the skin, the more damage there can be[.]" Appellants'

App. Vol. 2 at 183.[7]  It was not Southers's task to pinpoint the precise amount of contrast medium it would have taken to cause *any* injury to Nataomi; it was merely his task to state, based on his expertise, whether Osborne's alleged breach of the standard of care was a proximate cause of the injuries that Nataomi actually suffered.  The Rileys point out that Nataomi "faced a visible collection of caustic fluid just under her skin the same size as the fluid introduced by [RT] Osborne, within seconds of the injection."  Appellants' Br. at 31.  The causation issue here was not complex, and therefore we conclude that Southers was qualified to render an expert opinion and thus establish a genuine issue of material fact on that issue.  Consequently, we reverse the trial court's grant of summary judgment for the Hospital and remand for further proceedings.

Reversed and remanded.

Baker, J., and Kirsch, J., concur.

---

[7] Osborne testified that when Omnipaque infiltrates, the skin "swells; it gets red; it gets inflamed[,]" and "[t]he area gets hard."  Appellants' App. Vol. 2 at 183.